Joe MORGAN, Plaintiff–Appellee,

v.

Bill WOESSNER, Defendant,

and

Clay Searle; Los Angeles City, Defendants–Appellants (Two Cases).

Nos. 91–55728, 91–55863.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1992.

Opinion Filed Sept. 15, 1992.

Opinion Withdrawn June 10, 1993.

Opinion Filed June 10, 1993.

Thomas C. Hokinson, Sr. Asst. City Atty. and Richard M. Helgeson, Asst. City Atty., Los Angeles, CA, for defendants-appellants.

William A. Barnes and Edwin J. Wilson, Jr., Erickson, Beasley, Hewitt & Wilson, Oakland, CA, for plaintiff-appellee.

Before: SNEED and D.W. NELSON, Circuit Judges, and ROLL, District Judge.*

### ORDER

The opinion filed September 15, 1992, 975 F.2d 629, is withdrawn, and the attached opinion and dissent are filed in its place.

### OPINION

SNEED, Circuit Judge:

I.

### OVERVIEW

Joe Morgan, an ex-professional baseball player and television commentator, brought a section 1983 suit against Los Angeles police-

---

* The Honorable John M. Roll, United States District Judge for the District of Arizona, sitting by designation.

men Clay Searle and Bill Woessner and the City of Los Angeles for harm associated with Officer Searle's stop of Morgan at Los Angeles International Airport (LAX) in March of 1988. At the first trial, the jury found that Morgan had not been unlawfully detained. The district court, however, granted Morgan's motion for a judgment notwithstanding the verdict (JNOV) and a new trial because it found that Searle's stop of Morgan was unconstitutional as a matter of law.

At the second trial, the district court instructed the jury that the initial contact between Morgan and Searle was unconstitutional, and instructed it to determine only whether Morgan's subsequent arrest was lawful and whether Morgan suffered harm in connection with any unconstitutional conduct, and to consider Morgan's state law claims of false imprisonment, battery, and intentional infliction of emotional distress. The jury found for Morgan on all of these issues, and awarded Morgan a total of $90,000 in compensatory damages and another $450,000 in punitive damages. Searle and the City of Los Angeles appeal.[1] They challenge the grant of JNOV and the punitive damages awarded, and raise several other challenges concerning the district court's ruling on jury instructions and evidentiary matters. We affirm in part and reverse and remand in part the punitive damage award.

## II.

### FACTS

In presiding over this case, the district court was presented with seriously conflicting factual accounts of what precisely took place between Mr. Morgan and Officer Searle at LAX. In granting a JNOV, however, the district court concluded that *even on the basis of the defendants' account*, Officer Searle's stop of Morgan was unconstitutional as a matter of law. Because the conflicting accounts are very much relevant to the question of whether the district court's grant of JNOV was proper, as well as to the secondary question of whether the punitive damage awards were justified, we find it necessary to discuss each account in some detail.

### A. Joe Morgan's Testimony

On March 15, 1988, Joe Morgan was at LAX waiting for a flight to Phoenix. He passed the time in the gate area, chatting with people who recognized him. At some point during his layover, he decided to make a phone call. Leaving his bags at the waiting area, he headed to some phone banks about forty feet away. According to Morgan, while he was dialing, Agent Searle grabbed his shoulder and turned him around. Morgan asked Searle what he wanted. Searle insisted that Morgan was traveling with another person. Morgan responded that he was traveling alone, and asked again what the problem was. According to Morgan, Searle responded with words to the effect of "I'm doing a drug investigation and you're a part of it." Morgan again said he was alone; Searle insisted that Morgan was "with this guy" and told him "you are coming with me." Morgan replied, "Why am I coming with you? I didn't do anything. I am making a phone call." Searle did not tell Morgan that he was free to go.

Searle asked Morgan for identification. Morgan replied that it was in his luggage approximately forty feet away. Morgan took a step toward his luggage, and Searle grabbed his upper torso and told him, "I will put you on the ground if you don't come with me." Morgan testified that after this exchange, a bystander came up and said to the effect, "that's Joe Morgan, the baseball player, and I can identify him." Searle responded with hostility, flashing his identification and warning the bystander to back off.

Morgan testified that at that moment he began to get frightened: "Well, at that point ... I became very nervous. Before that, you know, I was standing up kind of saying, 'Hey, I don't want to go with you. Let me get my I.D.' or whatever, but he was very hostile.... I felt like it didn't matter if I did have my I.D.... He was going to do·something to me.... I said to him, 'Okay. Where do you want me to go?'" According to Morgan, Searle responded by pointing over Morgan's shoulder. As Morgan turned

---

1. Defendant Woessner was dismissed by stipulation of the parties.

toward that direction, Searle grabbed him around the neck from behind, forced Morgan to the floor, and handcuffed him.

While Morgan was on the ground, Agent Woessner came up with another man, Tony Floyd. As Woessner approached, Searle asked him, "You saw him swing at me, didn't you?" According to Morgan, one of the officers asked Floyd if Morgan "was the guy that was with you?" and Floyd answered no.

Searle pulled Morgan to his feet, and led him down the concourse, past the waiting area where Morgan had just been signing autographs. As they passed Morgan's luggage, Morgan again asked to be allowed to get his identification. Searle placed his hand over Morgan's mouth and nose and led him into a small room marked "nursery." Morgan testified that he had difficulty breathing and felt totally out of control. *Inside the nursery room, Floyd repeated that Morgan was not the person he was with.* Morgan testified that Searle threatened to report to the press that he was a part of a narcotics investigation, and offered to release Morgan if Morgan would promise to forget what had happened. Morgan responded, "You do what you have to do, and I'll do what I have to do." After a few moments of further exchange, Searle removed the handcuffs and allowed Morgan to leave.

According to Morgan, at no time during this course of events did he make any aggressive or hostile physical gestures toward either Searle or Woessner. He testified that at no time did he resist, use profanity, or scream.

### B. *Richard Ruybalid's Testimony*

Richard Ruybalid, an individual not otherwise associated with Morgan, was on the same plane into LAX as Morgan, and was waiting for the same connecting flight to Phoenix. Ruybalid had recognized Morgan on the flight, but did not speak to him. Ruybalid testified that he was making a call from the same phone bank as Morgan when Searle approached Morgan. Ruybalid's attention was caught by a "heated conversation." Ruybalid approached to within ten feet, and witnessed the confrontation between Morgan and Searle. Ruybalid heard

Searle saying to Morgan, "Come along. Come with us. Come with us." Morgan responded, "No I am not going. Leave me alone. I want to get my identification." According to Ruybalid, Searle was insistent, repeating "You are coming with us. Forget it. You are coming with us right now."

Ruybalid moved in closer and said, "Hey, what are you doing? That's Joe Morgan the famous baseball player." Searle responded by flashing his I.D. and saying, "Back off, narcotics officer." Ruybalid testified that at this time Morgan was not doing anything threatening or violent, but that Morgan's demeanor was defensive, bothered, angry. Ruybalid testified that Searle was very angry and his tone of voice very stern, and that Ruybalid felt he was being ordered to leave the area by a person of authority.

Ruybalid backed away, but continued to monitor the situation, remaining within fifteen or twenty feet from Morgan and Searle. He did not see Morgan taken to the floor, but he heard the noise caused by that fall. He testified that prior to that noise, he did not hear any yelling, screaming or swearing. When he heard the noise of the fall, Ruybalid approached the men; he observed Searle pull Morgan to his feet and lead him away, holding his hand over Morgan's mouth. Ruybalid testified that Morgan walked reluctantly but did not resist, and that he did not use any profanity or scream.

### C. *Defendants' Testimony*

On March 15, 1988, Searle and Woessner were on a routine narcotics patrol at LAX. They observed Tony Floyd, a black man, moving rapidly through the concourse. Floyd had a carry-on bag which appeared to be half-empty. Floyd made eye contact with Searle and Woessner, and then looked away. To the agents, he appeared to be nervous. Finding these actions suggestive of narcotics involvement, Searle and Woessner decided to question Floyd.

Searle and Woessner identified themselves to Floyd, and told him that he was not under arrest and that he was free to go. Floyd agreed to talk with them. They asked him for identification, but he had none. They

asked to look at his ticket, and he produced a one-way cash ticket issued in a name other than Floyd. They obtained permission to search his person and his carry-on bag; they found only clothing and toiletries. They then took Floyd to the men's room and conducted a pat down search which revealed nothing illegal, but did reveal that Floyd was carrying a second ticket. Although Floyd initially claimed to be traveling alone, he eventually admitted that he had a travel companion. Floyd did not remember the second person's name, but told the agents that the second traveler should be right behind him. The agents asked Floyd what the traveler looked like; Floyd responded that "he looks like me."

Based on their exchange with Floyd, the agents concluded that Floyd was a drug courier and that his companion was the "mule," the person who actually carried the drugs. The officers handcuffed Floyd, and left the bathroom with him to look for the second traveler. As they stepped out, they observed Morgan walking in their direction. The officers testified that Morgan was not running, or dressed unusually. The only thing that linked Morgan to Floyd was that both men were black. The officers found this significant because Floyd had said that the second traveler looked like him, and in their experience couriers tended to work with people of their own ethnic group. According to Searle and Woessner, when Morgan got within twenty feet of the trio he looked directly at them, stopped, and then abruptly turned around and started walking in the direction from which he had come.

Searle followed Morgan, and approached him as he was standing facing a telephone with the receiver in his hand. According to Searle, he tapped Morgan on the shoulder, displayed his identification card, and said, "I'm a police officer." Morgan immediately replied, "I don't give a fuck who you are." When Searle asked for identification, Morgan responded by saying, "I don't have to show you shit. I don't have any identification." Searle told Morgan that he was conducting a narcotics investigation, and that he wanted to determine if Morgan was traveling with anyone. Morgan responded by stating that he hadn't done anything, and by repeatedly yelling, at louder and louder volume, "You're not a police officer." Searle stated that he handed his police identification to Morgan, and that Morgan examined it and handed it back.

At that point, Searle testified that a citizen stepped forward, but that he did not remember him offering to identify Morgan. Searle testified only that he showed Ruybalid his I.D. and told him that he was a police officer.

Searle then told Morgan that he wanted Morgan to go with him to see if he was traveling with somebody, and gestured toward the direction of Agent Woessner. Searle testified that he did not believe Morgan was free to go at that moment, and that he believed that Morgan was required to show him some identification. Morgan kept asking "why, why," and Searle repeated his request:

Searle: I kept explaining to him I wanted to see if he was traveling with somebody, and eventually he starts walking with me. We probably take about three or four steps before he freaks out, before he starts screaming and then yelling.

Question: Okay. So you said, "I want to take you to some location or to take you to somebody so they can identify you?"

Searle: I said, 'I'd like you to go with me to see if you're traveling with this person we're investigating. That's all I want to do. I want to see if you are together and then we can solve this,' and he's screaming 'why, why' at the top of his lungs, but then he starts walking with me. I'd take a step and he'd take a step with me, and we eventually take some steps toward where I last left Agent Woessner and Mr. Floyd.

Question: So at this point, you were starting to leave the area of the phone bank?

Searle: Yes, we did.

Question: Okay. And about how far were you from the phone bank when you stopped again?

Searle: Probably maybe got 10 feet away eventually.

Searle Deposition, E.R. at 138–39.

Searle and Morgan walked toward Woessner and Floyd. According to Searle, after a few moments Morgan "freaked out" and be-

gan gesturing wildly, screaming at the top of his lungs. Woessner testified that he could hear Morgan yelling from some distance. Both officers testified that Morgan was waving his arms wildly; Searle had to duck to avoid getting hit, and at that point was bumped by Morgan's body. Searle grabbed Morgan around the chest and they fell to the floor; Searle ended up on top of Morgan. Searle testified that he told Morgan to put his hands behind his back, and that Morgan cooperated. Searle then got handcuffs from Woessner and cuffed Morgan.

Searle testified that then Morgan began screaming "Help, help" at the top of his lungs. As they walked down the concourse, Searle testified that he put his hand over Morgan's mouth to shut him up, because he was afraid that Morgan's screaming would attract attention and that "he didn't want another fight to break out with somebody else jumping in because he's screaming." Searle did not inform Morgan that he was under arrest or read him his rights. Once in the nursery room, Searle released Morgan after Floyd verified that Morgan was not his companion.

## III.

### PROCEDURAL BACKGROUND

#### A. Trial and Verdict

Based on this course of events, Morgan filed a complaint in the Central District of California, naming Searle, Woessner, and the City of Los Angeles as defendants. Morgan alleged that he had been falsely detained, arrested and imprisoned by Searle and Woessner, and brought eight claims under federal and state law.

Trial was held in April 1990. The record indicates that from the beginning, the district court believed that Morgan's detention was illegal as a matter of law.[2] However, the court chose to submit the question to the jury because it feared that a directed verdict on that issue would influence the jury's deliberations regarding whether Morgan had been the aggressor in the subsequent physical altercation and thus whether he was falsely imprisoned, and regarding whether damages were justified.[3] After deliberations, the jury found that Morgan's constitutional rights had not been violated because the detention was lawful.

#### B. JNOV and Second Trial

Morgan moved for a JNOV and a new trial, or in the alternative, asked that the district court make a finding as to damages. As noted above, the court granted a JNOV and the motion for a new trial. The second trial was held in February 1991. After both parties had put on their case, the district court instructed the jury a second time. This time, the court stated that the court had already decided that the initial contact between Searle and Morgan was a seizure unsupported by reasonable suspicion, and therefore that Searle had violated Morgan's constitutional rights.[4] After deliberations,

---

2. During the first jury's deliberations, the court remarked to counsel:

    Let me stop you for just one minute. I left one thing out ... and that is, that under no circumstances would I have permitted a jury to decide otherwise. There isn't any possible other conclusion but that the stop was illegal.

    E.R. at 7. And later:

    I think you will both have to give a lot of thought to what we are going to do because there is not the slightest doubt here about the portion of the case that deals with detention. Now, I will agree that there is a factual issue after the detention is made, but there is no factual issue up to that point.

    E.R. at 10.

3. The court observed:

    I think the mistake I made in this case was that I found that there was an illegal detention, and

I didn't tell the jury that.... I knew that if I told the jury that there had been an illegal detention of Mr. Morgan that that would—or at least I believed that that would dictate the remainder—the outcome of the remainder of the case or at least it would so heavily weight the case on one side that it is likely they would come in and find for the plaintiff on the rest of the case because it is the clearest credibility crisis here in this case that you could ever imagine.

    E.R. at 2.

4. The district court gave the following instruction:

    One of Mr. Morgan's claims is that he was detained by Officer Searle without due process of law, in violation of his constitutional rights....

    The Court has already determined, in prior proceedings in this case, (1) that Officer Searle

the jury returned a verdict for Morgan on his federal civil rights and state law claims. Specifically, it found: 1) that Morgan had suffered actual harm as a result of his unlawful detention; 2) that after the initial detention, Searle violated Morgan's constitutional rights by arresting him without probable cause and using excessive force against him, causing Morgan actual harm; and 3) that Searle falsely imprisoned Morgan, committed battery on Morgan, and intentionally inflicted emotional distress on Morgan (the state law claims). The jury awarded Morgan damages against Searle as follows: 1) claim one—$10,000 in compensatory and $150,000 in punitive damages; 2) claim two—$40,000 in compensatory and $150,000 in punitive damages; and 3) claim three—$40,000 in compensatory (awarded against defendants Searle and the City of Los Angeles) and $150,000 in punitive damages.

On February 28, 1991, the district court entered a judgment awarding Morgan a total of $90,000 in compensatory damages and $450,000 in punitive damages. The district court also awarded Morgan attorney's fees pursuant to 42 U.S.C. § 1988. Defendants Searle and the City of Los Angeles appeal.

### IV.

*DISCUSSION*

A. *The Judgment Notwithstanding the Verdict*

We review a grant of JNOV de novo. *Meehan v. County of Los Angeles*, 856 F.2d 102, 106 (9th Cir.1988). "A directed verdict is proper where the evidence permits only one reasonable conclusion as to the verdict; it is inappropriate if there is substantial

evidence to support a verdict for the nonmoving party." *Id.* Evidence should be viewed in the light most favorable to the nonmoving party. *Id.*

In directing a verdict for Morgan, the district court concluded, as a matter of law, that Morgan had been "seized" within the meaning of the Fourth Amendment, and that the seizure was unconstitutional because there was no reasonable suspicion to support it. We address these legal conclusions separately.

1. Morgan Was Seized

Stops under the Fourth Amendment fall into three categories. First, police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave. *Florida v. Bostik,* — U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Such brief, "consensual" exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures. Second, the police may "seize" citizens for brief, investigatory stops. This class of stops is not consensual, and such stops must be supported by "reasonable suspicion." *See, e.g., Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *United States v. Holzman,* 871 F.2d 1496, 1502 (9th Cir.1989). Finally, police stops may be full-scale arrests. These stops, of course, are seizures, and must be supported by probable cause. *Adams v. Williams,* 407 U.S. 143, 148–49, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

Defendants contend that Searle did not seize or detain Morgan until *after* Morgan allegedly became violent and tried to "take a

---

did detain Mr. Morgan prior to the time that any physical altercation arose between the two, and (2) that the detention was not justified by reasonable suspicion on the officer's part at that point in time. Therefore, plaintiff has established that his constitutional rights were violated in this one particular regard. It is however for you to determine if this violation was the proximate cause of damages to Mr. Morgan, and the amount of those damages.

It is also for you to determine if plaintiff has proved, by a preponderance of the evidence, that his rights were violated in any of the other ways specified in his other claims.

The Court has determined *only* that unlawful detention issue and in instructing you that the Court has made that determination, the Court does not indicate any view whatsoever as to which party is entitled to a verdict on any other issue in the case. You must reach your own fair and impartial verdict on those issues without regard to the conclusion reached by the Court with respect to the unlawful detention issue.

E.R. at 400–401.

swing" at Searle. Prior to that point, they contend that because Searle was merely questioning Morgan and Morgan was free to leave, the encounter was a consensual exchange not requiring either reasonable suspicion or probable cause. They contend that although Morgan was indeed seized after he allegedly became violent, the seizure was not unconstitutional because it was justified by Morgan's conduct at that point. Defendants also contend that a determination of whether Morgan was seized requires a resolution of facts in dispute, and that this issue therefore should have been left for the jury.

▮ In considering whether a stop is a "seizure" or merely a consensual exchange, the Supreme Court has observed:

[A] person is "seized" only when by means of physical force or a show of authority, his freedom of movement is restrained.... *As long as the person to whom questions are put remains free to disregard the questions and walk away,* there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

*United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (emphasis added). Thus, the "essential inquiry is whether the person stopped reasonably believed that he or she was not free to leave." *United States v. Patino,* 649

F.2d 724, 726–27 (9th Cir.1981) (citations omitted). This inquiry is largely a factual one which depends on the totality of the circumstances. *Id.* In granting a JNOV, however, the district court found that *even on the facts as construed in the defendants' favor,* Morgan was seized well before any alleged physical altercation took place. We agree. Based on the events that, according to Searle's own testimony, took place *before* Morgan allegedly "freaked out," we find that the district court was quite justified in finding that Morgan "reasonably believed" that he was not free to leave.

▮ By definition, a "consensual" exchange between police and citizens cannot take place in the absence of consent. When a citizen expresses his or her desire *not* to cooperate, continued questioning cannot be deemed consensual. In this case, according to Searle himself, Morgan never consented or otherwise conveyed a willingness to cooperate with Searle. Rather, Searle testified that after he approached Morgan, Morgan indicated in no uncertain terms that he did not want to be bothered. Despite Morgan's unwillingness, Searle insisted that Morgan answer his inquiries and demanded that Morgan come with him. We find that Morgan's unequivocal expression of his desire to be left alone demonstrates that the exchange between Morgan and Searle was not consensual.[5] Because the exchange was nonconsensu-

---

**5.** In addition to Morgan's expression of disinterest, other factors lend support to our conclusion that Morgan reasonably believed he was not free to leave. First, Searle's insistence that Morgan answer his questions may have indicated to Morgan that his cooperation was compelled. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *see also Martinez v. Nygaard,* 831 F.2d 822, 826 (9th Cir.1987).

Second, Searle testified that he believed that Morgan was not free to go. *See Mendenhall,* 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6. Although an officer's subjective belief is ordinarily irrelevant to the question whether a citizen believes that he or she is free to go, it becomes relevant if there is reason to believe that the officer's belief was conveyed to the detainee. In this case, the fact that Searle repeatedly demanded that Morgan accompany him heightens the likelihood that Searle conveyed his belief that Morgan was not free to go.

Third, Searle did not advise Morgan that he was not under arrest and that he was free to go. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319,

75 L.Ed.2d 229; *Patino,* 649 F.2d at 727; *U.S. v. Johnson,* 903 F.2d 1219, 1221. Although an officer's failure to advise a citizen of his freedom to walk away is not dispositive of the question of whether the citizen knew he was free to go, it is another significant indicator of what that citizen reasonably believed.

Fourth, according to Searle, Searle and Morgan traveled "maybe ten feet" in the direction of Woessner and Floyd before Morgan "freaked out." An officer's request that an individual accompany him to another location may tend to indicate that the individual reasonably believed that he was not free to walk away. *Royer,* 491 U.S. at 503, 103 S.Ct. at 1327. Finally, Searle made statements which intimated that an investigation focussed on Morgan, and such statements "easily could induce a reasonable person to believe the failure to cooperate would lead only to formal detention." *United States v. Berry,* 670 F.2d 583, 597 (5th Cir.1982) (en banc). In this case, Searle conveyed to Morgan that he was the specific target of Searle's concern in two ways.

al, we do not hesitate to find that Morgan was indeed seized well before he allegedly became violent. The district court correctly found that Morgan was seized within the meaning of the Fourth Amendment.

### 2. The Seizure Was Not Supported by Reasonable Suspicion

██ Having determined that Morgan was in fact seized, we now turn to the question of whether the seizure was supported by reasonable suspicion. It was not. At bottom, Searle stopped Morgan for two reasons: Floyd's tip, which essentially made all black men suspect, and the supposed fact that Morgan looked at them, turned and walked away. No court would be likely to find that reasonable suspicion supported a seizure.

The contrast between the facts of this case and the facts of a case in which the Supreme Court found no reasonable suspicion existed is illuminating. In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the Court found no reasonable suspicion where the police based their stop of defendant on the facts that: 1) defendant had arrived from a drug source city; 2) defendant arrived early in the morning, a time when law enforcement activity is diminished; 3) defendant and a second traveler tried to conceal the fact that they were traveling together; 4) defendant had no luggage other than a shoulder bag; and 5) defendant repeatedly looked over his shoulder in the direction of the other man. *Id.* at 441, 100 S.Ct. at 2754. For the Court, these factors described a "very large category of presumably innocent travelers, who would be subject to virtually random seizures were the court to conclude that as little foundation as there was in this case could justify a seizure." *Id.*

The only factors justifying the seizure of Morgan were the tip from Floyd, which put agents Searle and Woessner on the lookout for all black men, and the fact that Morgan appeared to look directly at them and turn abruptly around. These facts even fall short of the factors treated as insufficient to establish reasonable suspicion in *Reid*. There is no claim that Morgan was dressed in an unusual manner, that he was hurrying through the airport, that he was carrying anything unusual, that he seemed nervous, or that any of the other factors normally relied upon in justifying investigatory stops at airports existed.[6] Accordingly, we agree with the district court that no reasonable suspicion justified the seizure of Morgan.

The JNOV was entirely proper.

### B. *Punitive Damage Awards*

In challenging the punitive damages in this case, defendants advance two arguments. First, they contend that the award amounts were excessive and violative of due process. Second, they argue the jury and trial court were required under California law to consider Officer Searle's financial worth in deciding the amount of the state law punitive damages. We look first to the defendants' contentions under federal law and then under state law.

---

First, he told Morgan specifically that he was conducting a narcotics investigation, and that he wanted Morgan to accompany him so that he could see if Morgan was traveling with a person they were investigating. Second, and more importantly, the exchange with Ruybalid, even as under Searle's characterization, communicated to Morgan that he alone was the subject of Searle's attentions. Again, the exchange with Ruybalid occurred well before Morgan allegedly became violent.

In addition to the above factors, the Supreme Court has hinted that courts may consider whether "the investigative methods employed [are] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time" in determining whether the Fourth Amendment was violated, although the extent to which this factor is relevant is unclear.

*Royer*, 460 U.S. at 500, 103 S.Ct. at 1325; *see also Holzman*, 871 F.2d at 1501. Here, Searle, in the same amount of time it took him to walk over to Morgan, could have walked over to Morgan accompanied by Floyd. With Floyd in tow, it would have taken a second or two to determine that Morgan was not Floyd's companion, and Morgan would not have been disturbed at all. The fact that this alternative was so readily available may weigh in the Fourth Amendment calculus.

**6.** For cases in which the Supreme Court has found reasonable suspicion supported a stop, see *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326, and *United States v. Sokolow*, 490 U.S. 1, 3, 109 S.Ct. 1581, 1583, 104 L.Ed.2d 1 (1989).

#### 1. Punitive Damages Based on Federal Claims

As Part III.B. sets forth, the jury in the second trial awarded Mr. Morgan $300,-000 in punitive damages on his section 1983 claims against Officer Searle. It is well established that a "jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir.1991) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1982)). There is no problem with the imposition of some punitive damages in this case. We must decide, however, whether the amount of the imposition in this case comports with the Due Process Clause.

#### a. Haslip: Due Process Applies to Punitive Damages

The Supreme Court recently considered, in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the effect of the Due Process Clause on the award of punitive damages. After noting the growing concern with excessive awards, the Court said that "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 15, 111 S.Ct. at 1043. The Court there applied a Due Process analysis, which is described below, to the fairly elaborate Alabama system for imposing and reviewing punitive damages, and found that it comported with Due Process.

The Due Process Clause is a federal constitutional standard to be applied in the case of federal as well as state punitive damage awards. Although the Court in *Haslip* discussed the Due Process Clause of the Fourteenth Amendment, the Court's analysis applies equally under the Fifth Amendment. The two Clauses should be applied in the same manner when two situations present identical questions differing only in that one involves a proscription against the federal government and the other a proscription against the States.[7] If state punitive damage awards are subject to the strictures of the Constitution, there is no reason that the standards employed by federal courts to review federal punitive damage awards should escape the scrutiny of the Due Process Clause. It should make no difference whether the imposition of such damages was by a federal or state court or whether on federal or state claims. For this purpose there is only one Due Process Clause. The principles of *Haslip* are applicable, therefore, to punitive damages imposed by federal courts for violations of federal law.[8]

---

**7.** The Due Process Clause, as all know, first appeared in the Fifth Amendment of the Bill of Rights. Only in the aftermath of the Civil War did the Clause appear in the second sentence of Section 1 of the Fourteenth Amendment. According to Representative John Bingham of Ohio, a member of the Thirty-Ninth Congress which enacted the Fourteenth Amendment, the Fifth Amendment Due Process Clause was the source of that Clause in the Fourteenth Amendment. Cong. Globe, 39th Cong., 1st Sess. 1034 (1866). Bingham is said by many to be the father of that portion of the Fourteenth Amendment in which the Due Process Clause appears, and his paternity is quite widely accepted. *See Adamson v. California*, 332 U.S. 46, 73, 67 S.Ct. 1672, 1686, 91 L.Ed. 1903 (1947) (Black, J., dissenting). Of more importance to our issue is that Bingham himself frequently linked the Fourteenth Amendment's Due Process Clause with the Fifth Amendment.

**8.** In the previous version of this opinion, we thought that *Browning–Ferris Industries v. Kelco*

*Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), was the guiding Supreme Court opinion and that *Haslip* did not apply to punitive damages based on violations of federal law. Upon further reflection we have determined that it is *Haslip*, not *Browning–Ferris Industries*, that provides the guidance in this volatile area. It would be incongruous for the Due Process Clause of the Fourteenth Amendment to apply to state law punitive damages and the Due Process Clause of the Fifth Amendment not apply to federal punitive damages. We made a false distinction when we distinguished on the basis of the legal source of the punitive award. As was said in the text above, for this purpose, there is only one Due Process Clause.

Furthermore, *Browning–Ferris Industries* does not provide the guidance this court requires for dealing with challenges to the amount of a punitive damage award. The main holding in *Browning–Ferris Industries* was that the $6 million punitive damage award did not violate the Excessive Fines Clause of the Eighth Amendment. Al-

The Court in *Haslip* did not mandate a single standard, applied at a single level, for reviewing punitive damages. Instead, the Court held that the three-stage Alabama punitive damage system comported with the Due Process Clause. *Id.* at 16–18, 111 S.Ct. at 1044–46. In the Alabama system, the first stage is jury instructions crafted to describe the proper purpose of punitive damages.[9] The next stage is the trial court's review of the jury award for excessiveness.[10] The third stage is appellate court review.[11] A three-stage approach is appropriate in the context of the punitive damage issues in this case as well.

### b. The Three Stages of Due Process Scrutiny

The Supreme Court did not find that the elements of the Alabama system were necessary to comport with due process, but merely sufficient.[12] Although we adopt a three-stage approach similar to Alabama's, we need not look solely to the substance of its *Hammond* factors. Instead, we note that the "general concerns of reasonableness and adequate guidance from the court when the case

is tried to a jury properly enter into the constitutional calculus." *Haslip*, 499 U.S. at 15, 111 S.Ct. at 1043.

### 1. Jury Instructions by the Trial Court

As the first stage of scrutiny, a trial court should instruct the jury on the proper role of punitive damages. *Haslip* said that instructions should be fashioned to describe the proper purposes of punitive damages, so that the jury understands that punitive damages are not to compensate the plaintiff, but to punish the defendant and to deter the defendant and others from such conduct in the future. *Id.* at 16, 111 S.Ct. at 1044. In the case before us, the trial court performed this task by use of an instruction that focused upon the discretionary nature of the award, the need to punish the defendant, and the need to deter repetition of such conduct. Specifically, the instruction focused on (1) the reprehensibility of the conduct of the defendant, and (2) the amount of punitive damages which will have a deterrent effect on the defendant in light of the defendant's financial condition.[13] Although the court could have

---

though the Court considered the role of federal courts in cases involving punitive damage awards based on state law, and made it clear that a court of appeals should review the district court's decision concerning a jury award, it did not say what the substance of that review should be. *Haslip* provides the guidance that is necessary when dealing with punitive damages challenged on Due Process or excessiveness grounds, and today we employ its full Due Process review.

9. Under the Alabama system, the instructions explain that the purpose of punitive damages is not to compensate the plaintiff, but to punish the defendant and deter the defendant and others from such conduct in the future. *Id.* at 16, 111 S.Ct. at 1044.

10. The Supreme Court noted that Alabama trial courts look to what it called the *Hammond* factors after *Hammond v. City of Gadsden*, 493 So.2d 1374, 1379 (Ala.1986). *Haslip*, 499 U.S. at 16, 111 S.Ct. at 1044. In *Hammond*, the Alabama Supreme Court said the trial court should consider factors such as the culpability of the defendant's conduct, the desirability of discouraging similar conduct, the impact on the parties, and other factors including impact on innocent third parties. *Id.* The Alabama courts refined these criteria to the seven factors, listed in *Haslip* on page 1045 and in this opinion under Part IV.B.1.b.2, in *Green Oil v. Hornsby*, 539 So.2d 218, 223–224 (Ala.1989), and *Central Alabama*

*Electric Cooperative v. Tapley*, 546 So.2d 371, 376–77 (Ala.1989). We still call them by the original name, the *Hammond* factors, however.

11. The Supreme Court in *Haslip* approved the seven *Hammond* factors that Alabama courts use when considering punitive damages. 499 U.S. at 17, 111 S.Ct. at 1045. These factors are listed later in this opinion under Part IV.B.1.b.2.

12. Although *Haslip* does not require that we follow the Alabama system's procedure, it certainly permits it. The difference between the approach we take and that suggested by Judge Nelson in her dissent is that we believe a modified *Haslip* system for reviewing punitive damages is preferable to the uncertain elasticity of other standards.

13. The full instruction said, "In arriving at any award of punitive damages, you are to consider the following:

(1) The reprehensibility of the conduct of the defendant.
(2) The amount of punitive damages which will have a deterrent effect on the defendant in the light of defendant's financial condition.
(3) That the punitive damage must bear a reasonable relationship to the injury, harm, or damage actually suffered by the plaintiff."
E.R. at 428–29.

included instructions detailing that punitive damages are not to be used to compensate the plaintiff, the instructions on compensatory damages made this clear. The instructions in this case were adequate.

## 2. Trial Court Review of the Amount of the Award

As the second stage of scrutiny, a trial court should review the punitive award and record its reasons for upholding or altering it. The trial court can look to the *Hammond* factors [14] or other general elements of reasonableness to determine whether a punitive damage award should be upheld. The broader picture must not be lost. The task of the court is a comparison between the amount of punitive damages actually assessed and a figure derived from the facts of the case at hand. To arrive at this figure, the court should look to awards in similar cases and to its own experience. If the district court rejects the jury award, it should give the plaintiff the option of a remittitur or a new trial on the punitive damage issue.[15]

Here, the district court failed to record its reasons for finding the punitive award proper. Several courts dealing with punitives based on state law violations have remanded cases to the district court when they had failed to state the reasons for rejecting a challenge to the award. *American Employers Ins. Co., v. Southern Seeding Services, Inc.*, 931 F.2d 1453, 1458 (11th Cir.1991) (remanding case because district court failed to apply the *Hammond* criteria and reflect its reasoning for the denial of the motions to alter punitive award); *Cole v. Control Data Corp.*, 947 F.2d 313, 320 (8th Cir.1991) (remanding so the district court could review under the standard articulated in *Haslip*).

Following the lead of these cases, we think it best to remand the punitive award in this case to the district court to analyze it in light of this opinion and to record its reasons for its conclusion. This remand assures that the defendant will have the three stages of Due Process scrutiny endorsed by the Supreme Court in *Haslip*.

## 3. Appellate Court Review of Procedure and the Amount of the Award

As the third stage of scrutiny, an appellate court should undertake two distinct inquiries. First, it must satisfy itself that the defendant was afforded the two prior stages of scrutiny, *i.e.*, proper instructions and a recording of reasons for upholding or altering the award. If the district court failed to give proper instructions, a new trial is in order on that issue. If the district court failed to record its reasons for upholding or altering the award, as is the case here, the circuit court should remand the case so that the district court may make its analysis and record its conclusions. If either of the two prior stages is lacking, the circuit court should reverse and remand; it should not undertake the substantive review of the award.

The appellate court's second inquiry is a substantive review of the amount of the

---

This instruction properly informed the jury of the punishment and deterrence goals of punitive damages, as well as the noncompulsory nature of the award. Justice O'Connor's dissent in *Haslip* argued that instructions such as these were unconstitutionally vague. *Id.* at 31, 111 S.Ct. at 1056. She suggested that the *Hammond* factors would serve as adequate guidance to the jury. *Id.*, 499 U.S. at 38, 111 S.Ct. at 1061. While this may be prudent, the majority of the Court did not find it necessary.

14. The *Hammond* factors, as described by the Supreme Court, are:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred;

(b) the degree of reprehensibility of the defendant's conduct, duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation. *Haslip*, 499 U.S. at 17, 111 S.Ct. at 1045.

15. This is done to comply with the Seventh Amendment's guarantee to a trial by jury. This is discussed more fully under Part IV.B.1.c.

award. Appellate review, as the Supreme Court pointed out in *Haslip*, is necessary to ensure that the award does "not exceed an amount that will accomplish society's goals of punishment and deterrence." ... This appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition. *Id.* at 17, 111 S.Ct. at 1045 (citations omitted).

■■■ The Ninth Circuit's standard states that "[u]nless the amount of damages is grossly excessive, unsupported by the evidence, or based solely on speculation, the reviewing court must uphold the jury's determination of the amount." *Davis*, 927 F.2d at 1485 (citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir.1986)). In *Haslip*, the Court suggested that a "manifestly and grossly excessive" standard, such as the one used by this circuit, does not comport with Due Process. *Haslip*, 499 U.S. at 17 n. 10, 111 S.Ct. at 1045 n. 10.

Following this lead, the Fourth Circuit found in *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 105 (4th Cir.1991), that Virginia's "excessiveness" standard for reviewing punitive damages was lacking. The substantive content of the Ninth Circuit's "grossly excessive" standard is now refashioned to give it a definite shape and texture and to avoid any conflict with the Due Process Clause.[16] A circuit court should determine whether a punitive damage award exceeds the amount necessary to accomplish the goals of punishment and deterrence in deciding whether it is grossly excessive.

c. The Seventh Amendment's Guarantee to Trial by Jury

■■■ The Seventh Amendment's guarantee to a trial by jury may require a court reviewing an award of punitive damages to give a plaintiff the option of a new trial on punitive damages if it finds an award grossly excessive and otherwise would order a remit-

titur. The Supreme Court, it appears, has never given its blessing to an appellate court reducing an award without affording the plaintiff an opportunity to retry that issue. *See Browning–Ferris Industries*, 492 U.S. at 279 n. 25, 109 S.Ct. at 2922 n. 25.

Several circuits, however, have reduced the amount of punitive damages awarded without giving the plaintiff a choice of a new trial on that issue. *See, e.g., Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 207 (1st Cir.1987); *Shimman v. Frank*, 625 F.2d 80, 102–04 (6th Cir.1980); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1279 (7th Cir.1984); *Douglas v. Metro Rental Services, Inc.*, 827 F.2d 252, 257 (7th Cir.1987); *Guzman v. Western State Bank of Devils Lake*, 540 F.2d 948, 954 (8th Cir.1976). However, none of these cases considered the Seventh Amendment, and we do not think it wise to follow this course of action.

Two cases already have held that a remittitur without the option of a new trial is a violation of the Seventh Amendment. In *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984), the court reversed the district court's remittitur of punitive damages, without option of a new trial, against police officers in a section 1983 case. The court said, the "Seventh Amendment reserves the determination of damages, in jury trials within its scope, to the jury.... The proper corrective is to give McKinnon the choice he was improperly denied, between accepting the remittitur and having a new trial on damages." *Id.* 750 F.2d at 1392. The Fourth Circuit also held that the Seventh Amendment guarantees a right to a jury determination of the amount of punitive damages. *Defender Indust., Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502, 507 (4th Cir.1991) (en banc).

To avoid any conflict with the Seventh Amendment, the preferable course is to afford the party awarded the grossly excessive punitive damages, whether that is determined by a trial or appellate court, the option of either accepting the remittitur of the puni-

---

**16.** The recent grant of certiorari by the Supreme Court in *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 cert. granted, — U.S. —, 113 S.Ct. 594, 121 L.Ed.2d 532 (1992), does not alter our conclusion concerning our "grossly excessive" standard. It is likely the Supreme Court in *TXO* will further refine its *Haslip* standards.

tive damage award or a new trial on that issue. *See, e.g., Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1314 (7th Cir.1985); *Hollins v. Powell,* 773 F.2d 191, 198 (8th Cir.1985), *cert. denied,* 475 U.S. 1119, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); *Mason v. Texaco,* 948 F.2d 1546, 1561 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992).

### 2. Punitive Damages Based on State Claims

▇▇▇▇ The award of $150,000 on the state law claims presents a different problem. As was said above, the Due Process analysis is the same whether the punitive damages are based on federal or state law. The state punitive damages are treated separately here only because of the additional issue of evidence of financial worth. In reviewing a punitive damage award based on state law, the district court has an additional duty; it must make sure that the award is within the confines set by state law. *Browning–Ferris Industries,* 492 U.S. at 279, 109 S.Ct. at 2922. Recently, in *Adams v. Murakami,* 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991), the California Supreme Court held that an award of punitive damages cannot be properly reviewed unless the record contains evidence of a defendant's financial worth. The *Murakami* court held that such evidence must be presented to the jury, and that the burden of presentation lies with the plaintiff. Thus, defendants' contention that *Murakami* requires the trier of fact to consider evidence of defendants' financial worth in considering the appropriateness of punitive awards under California state law claims is accurate.

Therefore, we remand the state law portion of the damages award to the district court for the dual purposes of reconsidering that award in light of *Murakami* and *Haslip.* On remand, the district court shall consider evidence as to Officer Searle's financial worth, determine whether or not a remittitur is appropriate, and record the reasons for its conclusions.

### C. *Qualified Immunity Instruction*

▇▇▇ Defendants next take issue with the district court's refusal to give to the jury a qualified immunity instruction. Police officers "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words, police officers are entitled to assert a qualified immunity defense (and therefore to an instruction) only if they can *affirmatively* show that "their conduct 'was justified by an objectively reasonable belief that it was lawful.'" *Bilbrey v. Brown,* 738 F.2d 1462, 1467 (9th Cir.1984) (quoting *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

▇▇▇ Although it is not particularly clear, defendants' argument seems to be that they were entitled to a qualified immunity instruction because "while the law was clearly established that an officer may not detain an individual without reasonable suspicion, it was not firmly established how the principle applied to the entire question concerning airport stops involving potential drug couriers." [17]

We reject this contention. It was well-established at the time of this case that Fourth Amendment seizures occur when a person is not free to leave, and that such seizures must be justified by either probable cause or reasonable suspicion. Defendants offer no reason why we should draw a distinction between stops occurring in airports and those occurring in other places, or any reason why a police officer would believe that citizens' Fourth Amendment rights are somehow diminished in airports. Even if we *were* inclined to analyze as distinct the law of airport/courier stops, our conclusion would

---

17. Defendants also argue that determinations about qualified immunity are properly the province of the jury. However, there is no question that Judge Pfaelzer was entitled to decide this question as a matter of law. *See Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir.1988). In fact, in its latest word on the issue, the Supreme Court has indicated that "Immunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant,* —— U.S. ——, ——, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991).

remain the same. That law was well developed by the time the events leading to this suit took place—virtually every case the parties discuss in their briefs had been decided several years earlier.

■ Moreover, the Supreme Court has made clear that in the context of Fourth Amendment violations, there can be no inquiry as to a police officer's *subjective* intent or belief. Rather, only an officer's *"objective* 'good faith'—that is, whether he could reasonably have believed that [his conduct] did not violate the Fourth Amendment—may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983." *Graham v. Connor,* 490 U.S. 386, 399 n. 12, 109 S.Ct. 1865, 1873 n. 12, 104 L.Ed.2d 443 (1989) (emphasis in original). Thus, our conclusion that Officer Searle acted unconstitutionally as a matter of law is the end of our inquiry on qualified immunity. *See, e.g., Kennedy v. Los Angeles Police Dept.,* 901 F.2d 702, 706 (9th Cir.1989) ("Our preceding discussion about the obvious lack of probable cause is dispositive of the qualified immunity question."); *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991) (where police officer had used excessive force in violation of the Fourth Amendment, and relevant law was well established, officer is not entitled to qualified immunity); *cf. Hopkins v. Andaya,* 958 F.2d 881, 885 n. 3 (9th Cir.1992) ("In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits.").

Defendants do not argue that Searle had an objective "good faith" belief that his actions were constitutional. Nor could such a finding comport with the facts of this case. We note in particular the fact that *Agent Woessner* testified that at the time Morgan turned and walked away from the officers, they did not have reasonable suspicion that would justify detaining Morgan for a brief investigatory stop. In light of that testimo-

ny, a claim of objective good faith would be difficult indeed. We find that the facts of this case and our analysis regarding reasonable suspicion preclude a finding that Searle could have objectively believed that his conduct was constitutional. Therefore, we find that the district court did not err in refusing to give a qualified immunity instruction.

### D. *Reputation Testimony*

■ Defendants next contend that the district court erred in permitting Morgan to put on witnesses who testified as to his reputation. We disagree. We review a district court's evidentiary rulings for an abuse of discretion and will not reverse those decisions absent some prejudice to the appealing party. *Roberts v. College of the Desert,* 870 F.2d 1411, 1418 (9th Cir.1988).

■ The defendants objected in the district court to the admission of evidence as to Morgan's character and reputation on the ground that it was impermissible under Fed. R.Evid. Rule 403 as evidence of prior conduct indicating habit or custom. Defendants argued further that evidence would lead the jury to believe that Morgan would not have acted aggressively against Searle that day.[18] Morgan's counsel requested the introduction of this evidence for the purposes of establishing that because Morgan's reputation was so important to him, he suffered a great deal of emotional distress as a result of the unlawful arrest. The district court permitted the testimony, preceding it with the following cautionary instruction:

> The testimony which you are going to hear is not offered to show that Mr. Morgan did or did not act in any particular way on the date and at the time of the incident in question here. It is offered on the issue of damages, the damages that he has been claiming—that he does claim, so let me say it again to you.

---

**18.** In their opening brief, defendants refer to violations of Rules 404 and 405. However, defendants failed to challenge this testimony on any basis other than Rule 403 before the district court. Therefore, only a challenge on the basis of that rule has been preserved for appeal. *See United States v. Gomez-Norena,* 908 F.2d 497,

500 (9th Cir.) ("[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, [citations omitted], but also by making the *wrong* specific objection [citations omitted]"), *cert. denied,* 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990).

It is not offered to show or to convince you that Mr. Morgan did or did not do certain kinds of things on the date and at the time alleged herein but offered instead on the issue of the damages that Mr. Morgan is claiming.

We consider the question whether such evidence should have been admitted to be a fairly close one. The jury may well have been more inclined to believe Morgan rather than Searle once they heard from others about Morgan's integrity and good reputation. However, in civil cases, even the improper admission of evidence is not grounds for granting a new trial unless it constitutes prejudicial error. As discussed above, the jury had plenty of evidence from which to conclude that Searle rather than Morgan was the aggressor. Most important, however, is the probable effect of the district court's cautionary jury instruction and its statement expressly forbidding plaintiff's counsel from implying that such evidence went to habit or custom. We believe that those precautionary steps blunted significantly the impact of this testimony. Therefore, we conclude that the district court did not abuse its discretion in admitting this evidence.

E. *"Juror Irregularities"*

Defendants' final argument on appeal is that they are entitled to a new trial because of the following juror "misconduct": 1) after they were excused, some of the jurors told Los Angeles Times reporters that they had "wanted to send a message to City Hall" that police cannot act uncontrollably; and 2) three of the jurors revealed in interviews that the question of whether the damages should cover Morgan's attorney's fees was raised during deliberations, and one juror speculated that his attorney's fees might be around $90,000. Defendants argue that "the injection of such extraneous prejudicial information, and the use of these sorts of influence, to bear upon juror deliberations is improper and arguably falls within the exception to the prohibition contained in Fed. R.Evid. Rule 606(b)."

Without conducting an evidentiary hearing on the question, the district court refused to grant a new trial on the basis of this alleged misconduct. We review a district court's refusal to grant a new trial for an abuse of discretion. *Robins v. Harum*, 773 F.2d 1004, 1006 (9th Cir.1985).

Defendants offer no legal support for their argument that the sentiments revealed by the jurors constitute a basis for reversing the district court's denial of the motion for a new trial. Nor has our research revealed any. Therefore, we affirm the district court.

The juror's observations about sending messages to City Hall and speculation as to the amount of Morgan's attorney's fees simply do not constitute the sort of "extraneous prejudicial information" that falls within the scope of Fed.R.Evid. Rule 606(b). As we have observed before, "[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room." *Hard v. Burlington Northern R.R. Co.*, 870 F.2d 1454, 1461 (9th Cir. 1989). The jury observations complained of here are the type of subjective thoughts and beliefs which are beyond the scope of inquiry in a motion for a new trial on the grounds of juror misconduct.

A party has grounds to seek an evidentiary hearing to determine whether a new trial is necessary because of extrinsic prejudicial information "only when these materials are sufficient on their face to require setting aside the verdict." *Burlington Northern, Id.* at 1461. For example, in *Burlington Northern*, one juror told the others that he had worked in the same place as the plaintiff, that when he injured himself on the job he'd received paid leave, speculated that defendant railroad company had probably already compensated the plaintiff for his injuries, and brought to the deliberations regarding plaintiff's injuries his independent knowledge of x-ray interpretation. *Id.* at 1458. Although the allegations of juror impropriety made in *Burlington Northern* were far more direct and damaging than those advanced here, the *Burlington Northern* court found no violation of Rule 606(b) or other impropriety sufficient

to reverse a trial court's refusal to grant a new trial. *See also Carson v. Polley,* 689 F.2d 562, 579–82 (5th Cir.1982) (juror's speculations as to the weakness of plaintiff's case, the relationship between plaintiff and his attorney and the amount of fees plaintiff paid considered "the subjective thoughts and emotions that may have influenced a juror's deliberations" and therefore not the grounds of a motion for a new trial on the basis of juror misconduct.) In light of our past jurisprudence in this area, we have little difficulty affirming the district court's refusal to grant a new trial or hold an evidentiary hearing on the question of juror impropriety.

## V.

### CONCLUSION

We affirm the district court with respect to its decisions regarding the grant of JNOV, the question of Officer Searle's entitlement to a qualified immunity instruction, the admission of reputational evidence, and the issue of juror "improprieties." With respect to the federal punitive damages, we remand the issue to the district court to analyze the award under the principles set out in this opinion. Finally, with respect to the state law punitive damage awards, we remand to the district court so that it may hear evidence regarding Officer's Searle's financial condition. After considering that evidence, the district court is instructed to determine, following the reasoning of this opinion, whether to approve the award or grant a remittitur with the option of a new trial and to record its reasons for its conclusion.

AFFIRMED in Part and REVERSED and REMANDED in Part.

1. It is not at all clear that this court should even consider a due process claim. In their initial brief to this court, the defendants cited *Haslip,* but appeared to use that case merely to support their argument regarding the appropriate standard of review for claims that punitive awards are excessive. They never used the words "due process" nor did they cite to Supreme Court or lower federal court cases prior to *Haslip* which concerned due process arguments with respect to punitive damages. Only in their reply brief did they squarely raise the due process argument.

Thus, under this court's policy of not considering issues "not specifically and distinctly raised

D.W. NELSON, Circuit Judge, dissenting.

I respectfully dissent from portions of part IV.B of the majority opinion. I agree with my colleagues that, in our first opinion in this case, we erroneously granted a remittitur on the federal punitive damages award, reducing it from $300,000 to $100,000. I also agree that the state punitive damages award must be remanded under *Adams v. Murakami,* 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348 (1991). I part company with the majority, however, over its interpretation of the Supreme Court's decision in *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

Searle and the City make two separate arguments with respect to the size of the punitive damages award in this case. First, they question whether California's procedure for reviewing such awards comports with due process.[1] Second, they claim that the punitive damages award is generally "excessive." I address each of these arguments in turn.

1. The Due Process Claim

a. *Interpreting Haslip*

In *Haslip,* the Court considered whether a punitive damages award of $840,000 in an insurance fraud case violated due process. In finding that it did not, the Court favorably considered Alabama's common law procedures regarding the imposition and review of punitive damages. Alabama's system is three-tiered: (1) at the trial stage, there are detailed jury instructions regarding the purpose of punitive damages; (2) after any award of punitive damages, the trial court

and argued" in the opening brief, *Officers for Justice v. Civil Service Commission,* 979 F.2d 721, 726 (9th Cir.1992), we need not reach the due process claim. *See also United States v. Traynor,* 990 F.2d 1153 (9th Cir.1993) (holding that an appellant waives his right to raise a claim when he does not do so in the opening brief but only in the reply brief); *Belanger v. Madera Unified School District,* 963 F.2d 248, 250 n. 1 (9th Cir.1992) (refusing to consider issues not listed in "statement of issues presented for review" or in appellant's opening brief which are raised for the first time reply brief).

will scrutinize the award (application of the so-called Hammond factors) and consider defendants' motions for new trial or remittitur; (3) finally, the appellate court conducts an independent review using its own common law standards. *Id.* 499 U.S. at 16, 111 S.Ct. at 1045.

In finding that the Alabama review procedure met due process standards, however, the Court did not hold that the States must adopt, at a *minimum,* the Alabama procedure in order to survive constitutional review. The majority reaches beyond the Court's opinion to draw such a conclusion when, in fact, the *Haslip* court went out of its way to avoid taking such a formulaic approach:

> We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus.

*Haslip,* 499 U.S. at 15, 111 S.Ct. at 1043 (emphasis added). Indeed, Justice Scalia, who concurred separately, faulted the majority opinion in *Haslip* precisely because it did not take a bright line approach: "... the Court chooses to decide only that the jury discretion in the present case was not undue.... This jury-like verdict provides no guidance as to whether any *other* procedures are sufficiently 'reasonable' ..." *Haslip,* 499 U.S. at 17, 111 S.Ct. at 1046–47 (Scalia, J., concurring).

Rather than a bright line rule, then, the Court adopted a flexible approach which emphasized the overall reasonableness of a challenged review procedure. By its nature, such an approach is fact intensive and case specific. As such, it is consistent with the inherently variable nature of punitive damages. In his concurring opinion in *Haslip,* Justice Kennedy noted that punitive damages awards are bound to differ on a case-by-case basis.

> Some inconsistency of jury results can be expected for at least two reasons. First, the jury is empaneled to act as a decision-maker in a single case, not as a more permanent body.... Second, the generality of the instructions may contribute to a certain lack of predictability ... These features of the jury system for assessing punitive damages discourage uniform results, but nonuniformity cannot be equated with constitutional infirmity.

*Haslip,* 499 U.S. at 28, 111 S.Ct. at 1055 (Kennedy, J., concurring).

Thus, under my reading of *Haslip,* a due process analysis of a punitive damages award review procedure consists of two fundamental inquiries: (1) what safeguards are in place at the trial court level, when the factfinder makes the decision of whether or not to impose punitive damages?; and (2) what post-verdict review procedures are there, at the trial court and/or appellate levels, and how meaningful are they? This interpretation is consistent with that expressed by most circuit courts which have considered the decision. In *Eichenseer v. Reserve Life Ins. Co.,* 934 F.2d 1377 (5th Cir.1991), the Fifth Circuit expressly rejected the view that *Haslip* is "a vehicle for expansive appellate review of punitive damages awards." 934 F.2d at 1382. Instead, that court interpreted *Haslip* narrowly, as requiring

> two practical considerations: (1) whether the circumstances of the case indicate that the award is reasonable, and (2) whether the procedure used in assessing and reviewing the award imposes a sufficiently definite and meaningful constraint on the discretion of the factfinder.... This is a fact intensive analysis.

*Id.* 934 F.2d at 1381–82. *See also Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992) (affirming a $6 million punitive damages award).

Similarly, the Eighth Circuit rejected the defendant's argument that *Haslip* identified "the Alabama process ... as setting a minimum standard for acceptable due process in the awarding of punitive damages." *Latham Seed v. Nickerson Am. Plant Breeders,* 978 F.2d 1493 (8th Cir.1992). *See also Jordan v. Clayton Brokerage Co. of St. Louis, Inc.,* 975 F.2d 539 (8th Cir.1992); *Peoples Bank and*

*Trust v. Globe Intern. Publishing, Inc.*, 978 F.2d 1065 (8th Cir.1992).[2] The Second and Eleventh Circuits also have interpreted *Haslip* as standing for a more generalized, flexible due process analysis of punitive awards which focuses on overall reasonableness. While the Second Circuit reduced a punitive damages award in *Vasbinder v. Scott*, 976 F.2d 118 (2nd Cir.1992), it nonetheless did so under a broad interpretation of *Haslip* as requiring that such awards be "reasonable and rational." 976 F.2d at 121. Taking a similarly broad approach to *Haslip*, the Tenth Circuit reduced a punitive damages award from $25 million to $12.5 million in a products liability case. *Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992).[3]

### b. *Applying Haslip to this case*

In light of *Haslip*, I would review the defendants' due process claim with respect to the $450,000 punitive damages award under a two-stage inquiry. First, I would consider what safeguards were in place at the trial court level to insure that the award was reasonable in light of the defendants' actions and the punishment and deterrence goals of punitive damages. Second, I would consider what post-verdict review procedures there were to further assess the reasonableness of the award.

The touchstone of the first level inquiry is the trial court's instruction of the jury. In this case, the district court gave the standard California instruction on the imposition of punitive damages:

> You may in your discretion award such damages, if, but only if, you find *by clear and convincing evidence* that said defendant was guilty of oppression or malice in

2. I note, however, that the Eighth Circuit recently withdrew a major opinion on the constitutionality of a punitive damages award in order to hear the case *en banc*. *Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 979 F.2d 1314 (8th Cir. 1993).

3. Only the Fourth Circuit has read *Haslip* to require the States to parrot Alabama's system of reviewing punitive damages awards. *See Johnson v. Hugo's Skateway*, 974 F.2d 1408 (4th Cir. 1992) (en banc); *Mattison v. Dallas Carrier Corp.*,

the conduct on which you base your finding of liability.

> 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard for the rights or safety of others. A person acts with conscious disregard of the rights and safety of others when he is aware of the probable dangerous consequences of his conduct and willfully and deliberately fails to avoid those consequences....

Jury Instruction (emphasis added). With respect to the amount of punitive damages, the district court instructed the jury as follows:

> The law provides no fixed standards as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, *exercised without passion or prejudice.*
>
> In arriving at any award of punitive damages, you are to consider the following:
> (1) The *reprehensibility of the conduct of the defendant.*
> (2) The amount of punitive damages which will have a *deterrent effect on the defendant in the light of defendant's financial condition.*
> (3) That *the punitive damages must bear a reasonable relationship to the injury, harm, or damage* actually suffered by the plaintiff.

Jury Instruction (emphasis added).

As the majority opinion concedes, these instructions clearly satisfy the concerns of the *Haslip* court:

> [The Alabama instructions] enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrong doing of the

947 F.2d 95 (4th Cir.1991). In *Johnson* and *Mattison*, the Fourth Circuit invalidated Virginia's and South Carolina's review processes, respectively, because they did not correspond to the Alabama model. As with the majority's opinion today, such an outcome amounts to the imposition "upon the state [of Virginia of] a federal common law [of punitive damages]." *Johnson*, 974 F.2d at 1425, 1428 (Luttig, J., concurring in part, dissenting in part).

kind involved, and explained that their imposition was not compulsory.... As long as the discretion [to award punitive damages] is exercised within reasonable constraints, due process is satisfied.

*Haslip,* 499 U.S. at 16, 111 S.Ct. at 1044. First, the California instructions limit the jury's discretion to award punitive damages in at least three respects.[4] The court also instructed the jury that, in order to award punitive damages in any amount, it had to first find that the defendant acted with "oppression or malice" and defined these terms for the jury. Finally, the court warned the jury that it could not act out of prejudice and passion.

The California instructions in this case also meet the *Haslip* requirement of discussing the nature and purpose of punitive damages. The instructions spell-out the purposes of punishment of the defendant and future deterrence. And, importantly, they explicitly link these purposes to the degree of reprehensibility of the defendant's conduct and the defendant's financial condition. In these respects, the California instructions on punitive damages are *more stringent* than Alabama's. *Accord Hilgedick v. Koehring Finance Corp.,* 12 Cal.App.4th 330, 8 Cal.Rptr.2d 76 (1992); *Wollersheim v. Church of Scientology of California,* 10 Cal.App.4th 370, 15 Cal.App.4th 1426, 6 Cal.Rptr.2d 532 (1992).

I would next inquire into the post-verdict procedures for reviewing punitive damages. Under *Haslip,* we assess this review process to "make[ ] certain that the punitive damages are reasonable in their amount and rational

in light of their purpose to punish what has occurred and to deter its repetition." *Haslip,* 499 U.S. at 17, 111 S.Ct. at 1045. In the absence of statutory review procedures, we again turn to the California common law review procedure for reviewing punitive damages awards.[5] Under state common law, the district court was required to sit as an independent trier of fact when reviewing the award of punitive damages. *Hilgedick,* 12 Cal.App.4th at 353, 8 Cal.Rptr.2d 76 (citations omitted). In considering defense motions for a new trial or a judgment notwithstanding the verdict, the trial court should consider the following factors: (1) the relative egregiousness of the defendant's conduct; (2) the relationship between the punitive award and the plaintiff's injury; and (3) whether the size of the award reasonably relates to the defendant's financial condition. *Wollersheim,* 10 Cal.App.4th at 383–387, 6 Cal.Rptr.2d 532 (citations omitted). While not word-for-word like Alabama's so-called Hammond factors, the California factors parallel the concerns expressed in the Alabama common law review procedure, and so I would uphold them.[6]

In contrast to my colleagues in the majority, I conclude that the twin processes of instructing the factfinder about the nature and purpose of punitive damages and the independent post-verdict review by the trial court meet the requirements of *Haslip.* These procedures are "meaningful and adequate" rather than "standardless," and so comport with the general reasonableness requirements of *Haslip.*

4. It is worth noting that the trial court instructed the jury to make its findings under the "clear and convincing evidence" standard, an evidentiary standard is more stringent than Alabama's preponderance of the evidence standard.

5. The California Supreme Court has not addressed directly the issue of whether California's common law review procedures comport with *Haslip.* In *Murakami,* the court expressly declined to reach this issue, 54 Cal.3d at 118, 284 Cal.Rptr. 318, 813 P.2d 1348, but the court recently granted review petitions in two cases which squarely raise the issue. *See Gourley v. State Farm Mutual Automobile Insur. Co.,* 92 Daily Journal DAR 9796 (July 9, 1992); *MGW, Inc. v. Fredricks Development Corp.,* 10 Cal. Rptr.2d 85, 832 P.2d 586 (1992).

6. Once again, I note that California's system appears to be more strict than the trial court review procedure approved in *Haslip* in terms of the degree of independence attributed to the trial court's review of the award. In the case at bar, furthermore, the trial court was especially well-suited to such a task, as it had heard first-hand the evidence in two trials of the same case. So, while the district court was not required to and did not state its reasons for rejecting the defendants' motions for a new trial and judgment notwithstanding the verdict on the record, it was required to consider these defense motions independently.

## 2. Excessiveness Claim

In addition to claiming that the general process of awarding punitive damages violated due process, Searle and the City argue that the award is "excessive" and that the district court erred by failing to reduce it. We review for abuse of discretion a district court's decision to grant or deny a motion for a new trial or remittitur because of the size of a punitive damages award. *Browning–Ferris Industries*, 492 U.S. at 278, 109 S.Ct. at 2922.

The defendants argue that the Court effectively overruled much of its holding in *Browning–Ferris Industries* with *Haslip*. Despite its concern with punitive damages, *Haslip* does not affect the abuse of discretion standard of review mandated by *Browning–Ferris Industries*; the two cases concern fundamentally different questions. Whereas *Browning–Ferris Industries* deals with the standards of appellate review of common law procedures for reviewing punitive damage awards, *Haslip* concerns the overarching constitutional validity of these very procedures. *Haslip* did not expressly or impliedly overrule any holding in *Browning–Ferris Industries*.[7]

In short, even after *Haslip*, we continue to review the defendants' excessiveness claim under an abuse of discretion standard.[8]

This court must uphold a punitive damages award "[u]nless the amount of damages is grossly excessive, unsupported by the evidence, or based solely on speculation...."

*Id.* 927 F.2d at 1485 (citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)). Under this deferential standard of review, I would uphold the punitive damages award on the federal claims. Although there was conflicting testimony about the altercation between Morgan and the officers, the jury clearly was persuaded by Morgan's testimony and that of the other witnesses for the plaintiff. Thus, the evidence supports a finding that state actors violated Morgan's civil rights under Section 1983 and that the defendants' conduct "involved a reckless or callous indifference to the constitutional rights of others" warranting punitive damages. *Id.* 927 F.2d at 1485.

The "grossly excessive" standard involves an inquiry into the relationship between the wrong committed and the goals of punishment and deterrence which punitive damages serve. The jury found that Searle initially approached and further harassed Morgan solely because of his African–American race. By awarding substantial punitive damages, the jury publicly condemned this conduct. Further, this award serves to deter generally police officers who might single out citizens on the basis of their race. In this context, we find that an award of $300,000 in punitive damages is not "grossly excessive." Prior to today's decision by the majority, this circuit never had reversed a punitive damages award in a police misconduct case on the ground that it was too large.[9]

---

7. Some courts have read a footnote in *Haslip* as condemning, for constitutional infirmity, state common law procedures for awarding and reviewing punitive damages which do not mirror those in Alabama. *See Mattison*, 947 F.2d at 106. In note 10, the Court does note differences between the Alabama method which it approves and other methods:

> In those respective schemes, an amount awarded would be set aside or modified only if it was 'manifestly and grossly excessive,' or would be considered excessive when 'it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience.'

*Haslip*, 499 U.S. at 17 n. 10, 111 S.Ct. at 1045, n. 10 (citations omitted).

I do not believe that the Supreme Court intended to overrule *Browning–Ferris Industries* in a footnote. The Court itself noted, in that case, that the defendants' had not made

the due process claim. Further, there is not evidence to suggest that each and every "shock the conscience" or similar common law standard would fail to pass constitutional muster. Under my reading of *Haslip*, each procedure would have to be assessed on a case-by-case basis to explore the content of the common law standard.

8. This conclusion is buttressed by the fact that, subsequent to *Haslip*, this court has relied on the standard of review articulated in *Browning–Ferris Industries*. *See Davis; Larez v. City of Los Angeles*, 946 F.2d 630, 639 (9th Cir.1991).

9. In two recent police misconduct cases, this court upheld the punitive damages awards against excessiveness challenges. *See Corder v. Gates*, 947 F.2d 374 (9th Cir.1991); *Larez*, 946 F.2d at 639.

Because I believe that neither the defendant's due process nor excessiveness claims have merit, I would affirm the punitive damages award as to the federal claims. I respectfully dissent.