55 F.3d 1445
 149 L.R.R.M. (BNA) 2457, 149 L.R.R.M. (BNA) 2858,
130 Lab.Cas. P 11,345, 130 Lab.Cas. P 11,367,
31 Fed.R.Serv.3d 1222, 95 Daily Journal D.A.R. 9305
 Douglas MURRAY, Plaintiff-Appellee-Cross-Appellant,
v.
LABORERS UNION LOCAL NO. 324; Jesse Thomas; Jesse Durran,
Jr.; Jesse Durran, Sr.; Charles J. Evans; Bob
Davis, Defendants-Appellants-Cross-Appellees.
 Nos. 93-15641, 93-16176 and 93-16540.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 17, 1995.
Decided May 31, 1995.
As Amended on Denial of Rehearing and Suggestion for
Rehearing En Banc; Cross-Appellees' Application
for Attorney's Fees Denied July 14, 1995.
 
 Christopher W. Katzenbach, Katzenbach and Khtikian, San Francisco, CA, for plaintiff-appellee-cross-appellant.
 Sandra Rae Benson, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, CA, for defendants-appellants-cross-appellees.
 Appeals from the United States District Court for the Northern District of California.
 Before: SNEED and O'SCANNLAIN, Circuit Judges, and MERHIGE,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 Appellants, a labor union, four of its officers, and one of its members, appeal from the judgment of the district court, entered after a jury verdict, holding them liable for violating Appellee Douglas Murray's rights under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA). Murray cross-appeals, claiming that the district court erred by granting directed verdicts in favor of the Appellants on several claims and by refusing to vacate an unfavorable arbitration award.[1] We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 Appellant Laborers Union Local No. 324 (the Union) represents construction workers. Appellants Jesse Thomas, Jesse Durran, Jr., Charles Evans, and Bob Davis are officers of the Union, and Appellant Jesse Durran, Sr. is a now-retired member of the Union. Appellee and Cross-Appellant Murray is a member of the Union and a longtime dissident. Murray brought suit following a series of clashes with Union officers.
 
 A. Job Referral
 
 3
 The first dispute involved a job referral. Ordinarily, Union members are dispatched to jobs as their names come up on the "plug" board in the hiring hall. As jobs are given to those listed at the top of the board, those beneath them move up and are next in line to receive positions. Under certain circumstances, however, employers are allowed to request a Union member by name in a referral letter, in which case the member is dispatched regardless of the position of his name on the plug board.
 
 
 4
 In December 1988, an employer, National Energy Constructors (NEC), issued a referral letter for Murray and several others. At the time, Murray was attending classes at a training center, of which the Union was aware. Nonetheless, the Union did not attempt in any way to contact Murray. Jesse Durran, Jr., who saw Murray at the training center during December, not only was rude to Murray but did not tell him about the letter.
 
 
 5
 By the time Murray learned about the referral letter, the job with NEC was apparently no longer available. Murray filed a hiring hall grievance against the Union for not contacting him. The permanent hiring hall arbitrator, Gerald McKay, in due course ruled that the Union was not contractually obligated to tell Murray about the letter.
 
 
 6
 B. Collection of Arbitration Costs from Murray's Dues
 
 
 7
 When NEC refused to issue a second referral letter, Murray attempted to file a grievance against NEC for discrimination. Instead of following the procedure for a grievance against an employer, however, Murray filed another hiring hall grievance. On July 5, 1989, arbitrator McKay ruled that Murray's complaint could not be redressed through the hiring hall grievance process because his dispute was with NEC, not the Union. He ordered Murray to pay the costs of arbitration for having filed a frivolous hiring hall grievance.
 
 
 8
 In mid-January 1990, the dispute between Murray and the Union moved to another level when Murray prepaid his union dues in order to maintain his eligibility to run for office in the upcoming election. In February, the Union sent Murray the bill for its arbitration costs, totaling $802, which Murray contested. In March, the Union informed Murray by letter that it had applied Murray's prepaid dues towards the arbitration costs and would continue to apply Murray's dues until the amount was paid off. Murray paid the full assessment under protest in order to maintain his eligibility to run for office.
 
 C. Distribution of Literature
 
 9
 Murray, in an effort to reach the rank and file of Union members, edited and published several editions of a newsletter entitled "Pick & Shovel," which tended to be critical of the Union and its leadership. He distributed it, along with other labor literature, in the Union's hiring halls in various towns over the course of a year. In June 1989, shortly before arbitrator McKay's July 5, 1989 ruling, Murray was setting up to distribute literature in the hiring hall in Martinez, California, when Charles Evans approached him and told him not to hand out literature. Murray refused to leave, and Evans called the police. When the police arrived, they asked whether there was a union rule against distributing literature, to which Evans replied that there was not. The police left without taking any action against Murray.
 
 
 10
 At the June meeting, the Union membership voted in favor of a rule barring solicitation and distribution of literature in hiring halls during dispatch hours. Signs announcing the "No Solicitation, No Distribution" rule were subsequently posted in the hiring halls.
 
 D. The October 24, 1989 Meeting
 
 11
 A regular Union meeting was held on October 24, 1989, at which, as part of the routine agenda, the minutes of the prior meeting were read. During this period, Murray contested the accuracy of the minutes. The minutes were nonetheless approved. The not-easily repressed Murray attempted to speak again during an unrelated agenda topic. The Union president, Jesse Thomas, ruled Murray out of order and demanded repeatedly that he "shut up and sit down." Union officials, Evans and Davis, joined in the demand. When Murray refused to do so, Thomas ordered Murray to leave. Murray refused. Thomas told the sergeant-at-arms, John Alford, to escort Murray out. Alford hesitated, and Thomas asked the membership generally to help Alford remove Murray. Durran, Jr. approached and tried to pick up Murray's briefcase, but Murray prevented him, and a scuffle ensued. Jesse Durran, Sr. entered the fray and grabbed and pulled Murray's hair. Order was eventually restored when other Union members broke up the fight. Murray remained at the meeting.
 
 
 12
 Murray did not rest; he filed suit in federal court on November 27, 1989. His first amended complaint alleged various violations of his rights under the LMRDA, breach of the duty of fair representation, assault and battery, and conversion.
 
 
 13
 A jury trial began on February 16, 1993. Following the presentation of Murray's case, Appellants moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. The court rendered judgments in favor of Appellants on the following causes of action: (1) the duty of fair representation claim; (2) the assault and battery claims against the Union, Thomas, Evans, and Davis; (3) the LMRDA claim; and (4) the conversion claim, both arising from the Union's collection of arbitration costs from Murray; and (5) the LMRDA claim for infringement of the right to participate in and vote at Union meetings. The remaining claims were submitted to the jury.
 
 
 14
 The jury found that the Union and three of its officers, Evans, Thomas, and Durran, Jr., had violated Murray's right of free speech under the LMRDA.[2] The jury awarded Murray $100 in compensatory damages, plus punitive damages: $50,000 against the Union, $10,000 against Thomas, $10,000 against Durran, Jr., and $7,500 against Evans. The jury further found that Jesse Durran, Sr. had committed assault and battery, and awarded Murray $100 in compensatory damages and $1,000 in punitive damages against him.[3]
 
 
 15
 The court denied the Union's post-trial motions for judgment as a matter of law and for a new trial. The court granted Murray's motion for attorney's fees and costs and awarded him $28,298.20. In a companion case, the court denied both Murray's motion to vacate the arbitration award and his motion for injunctive relief against the Union.
 
 
 16
 The Union timely appeals, and Murray timely cross-appeals. This court has jurisdiction under 28 U.S.C. Sec. 1291.
 
 II.
 DISCUSSION
 A. Right to a Unanimous Verdict
 
 17
 The trial lasted three and a half days. Judge Walker then gave the jury their instructions, and they began deliberating at about 12:30 p.m. on a Monday. The next day, events unfolded that presented to Judge Walker a very difficult situation. The jury on that day deliberated only until about 11:00 a.m., because one juror had to leave for a job interview. At that point, Juror Giancoli told the judge that he would have to leave early the following day, Wednesday, to attend a board meeting. The court quite properly expressed concern about the prospect of the jury taking half the day off two days in a row.
 
 
 18
 On Wednesday, the jury resumed deliberations at 8:00 a.m. The judge received three notes from the jury that morning.[4] The first note, unsigned, stated: "1) JURY CANNOT REACH UNANIMOUS VERDICT. 2) JURY CANNOT REACH UNANIMOUS DETERMINATION AS TO SCHEDULE TO ACCOMMODATE ALL." A schedule of juror conflicts was attached. At 9:00, a note signed by Juror Giancoli was received. It read, "JURY IS HOPELESSLY DIVIDED."[5] Fifteen minutes later, another note was sent out. It read, "We the undersigned believe the jury has come so close to a final verdict that we would like to continue deliberating." The note was signed by seven jurors--all but Juror Giancoli. Obviously the signals being sent by the jury were mixed.
 
 
 19
 Judge Walker thereupon excused Juror Giancoli from service in order to allow the remaining jurors to continue deliberations that afternoon.[6] After Juror Giancoli was excused, the jury deliberated for another half an hour before reaching their verdict. It was learned after trial that Juror Giancoli was the holdout in favor of a defense verdict.
 
 
 20
 Appellants claim that their right to a unanimous verdict was violated, and that they are entitled to a new trial. The Seventh Amendment requires jury verdicts in federal civil cases to be unanimous. Johnson v. Louisiana, 406 U.S. 356, 369-70 & n. 5, 92 S.Ct. 1620, 1637 & n. 5, 32 L.Ed.2d 152 (1972) (Powell, J., concurring); Andres v. United States, 333 U.S. 740, 748 & n. 13, 68 S.Ct. 880, 884 & n. 13, 92 L.Ed. 1055 (1948); American Publishing Co. v. Fisher, 166 U.S. 464, 467-68, 17 S.Ct. 618, 619, 41 L.Ed. 1079 (1897); see also Fed.R.Civ.P. 48 ("Unless the parties otherwise stipulate, ... the verdict shall be unanimous...."). While Rule 47(c) of the Federal Rules of Civil Procedure allows a judge to excuse a juror from service during deliberation for good cause, "[i]t is not grounds for the dismissal of a juror that the juror refuses to join with fellow jurors in reaching a unanimous verdict." Fed.R.Civ.P. 47(c), advisory committee note (1991 amendment); see also United States v. Hernandez, 862 F.2d 17 (2d Cir.1988) ("That a juror may not be removed because he or she disagrees with the other jurors as to the merits of a case requires no citation."), cert. denied, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989).
 
 
 21
 This type of case readily invites an appellate court to second-guess a trial court. This is a temptation we must resist while protecting the right of all parties to the judgment of the jury that was selected to hear the case. As already indicated, this right is a qualified one. Jurors are people whose needs and circumstances sometimes must be ascendent.
 
 
 22
 In support of their claim, Appellants rely mainly on Hernandez. In that case, the Second Circuit reversed the defendants' convictions because the trial court judge had improperly removed the lone holdout for acquittal from the jury. During deliberations, the other jurors sent several notes to the judge. At first, the notes complained of the juror's disruptiveness and lack of "rational common sense." Id. at 20. The judge, after being informed that the juror might have mental problems, considered removing him, but instead decided "to wait and [see] what I am going to do if there is a hung jury. I won't cross the bridge now." Id. at 21. Later, the notes from the jury indicated that the eleven other jurors were "making some progress" with the holdout juror. Id. After another day of deliberations, when it became clear that the juror would not "change his mind," the judge excused him. Id. at 21-22. After half an hour more of deliberations, the jury returned guilty verdicts against all the defendants. Id. at 22.
 
 
 23
 The trial judge had waited too long before removing the disturbed juror. The Second Circuit reasoned that it could not "be confident that [the juror's] disagreement with his colleagues was not the cause of his removal." Id. at 23. Even if removal of the juror for mental incompetence was justified, it should have been done as soon as that incompetence was evident. Instead, the judge waited two days to see whether the jury would deadlock. "The record thus seems to reflect that the cause of the removal was as much to avoid a mistrial because of a hung jury as to excuse an incompetent juror." Id. The combination of the uncertainty of the record regarding the cause of removal, the delay, and the judge's prejudicial remarks[7] to the jury required reversing the convictions. Id.
 
 
 24
 This case is different. In this case, the notes from the jury are ambiguous. They do not create a compelling inference that the jury was split between Juror Giancoli and the remaining jurors. Judge Walker moved promptly. Neither his remarks nor his actions indicate in any way that he chose to remove Juror Giancoli because he perceived him to be the lone obstacle to a unanimous decision.
 
 
 25
 Furthermore, we find that, under the circumstances of this case, the removal of Juror Giancoli due to his scheduling conflict meets the "good cause" standard. Although "[s]ickness, family emergency or juror misconduct that might occasion a mistrial are examples of appropriate grounds" for excusing a juror, Fed.R.Civ.P. 47(c) advisory committee note (1991 amendment), the judge's discretion is not limited to those scenarios. " '[J]ust cause' ... embraces all kinds of problems--temporary as well as those of long duration--that may befall a juror during jury deliberations." United States v. Reese, 33 F.3d 166, 173 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 756, 130 L.Ed.2d 655 (1995). Thus, for example, the decision to excuse a juror who had to attend a week-long business trip has been approved. Reese, 33 F.3d 166. This court has even upheld the decision to excuse a juror who had a planned vacation. United States v. McFarland, 34 F.3d 1508 (9th Cir.1994). Unlike the situation in United States v. Tabacca, 924 F.2d 906 (9th Cir.1991), the jury in this case had already experienced a significant delay at the outset of deliberations, with the possibility of further delays, when Judge Walker decided to excuse Juror Giancoli. Moreover, the issues of fact and law involved in this case appear to be considerably more complicated than those in Tabacca, increasing the risk that further disruption of the deliberation process would dull the jurors' memories and concentration. District court judges must have ample discretion to control their dockets. The removal of Juror Giancoli for good cause early in the day in order to allow the rest of the jury to continue deliberating was entirely proper.
 
 
 26
 B. Infringement of Murray's Free Speech Rights
 
 
 27
 The Union also argues that the jury verdicts finding violations of Murray's speech rights are unsupported by the evidence and contrary to law. Jury verdicts are reviewed to determine whether they are supported by "substantial evidence," that is, such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Davis v. Mason County, 927 F.2d 1473, 1486 (9th Cir.), cert. denied, 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). The credibility of witnesses and the weight of the evidence are issues for the jury that are generally not subject to appellate review. Oviatt v. Pearce, 954 F.2d 1470, 1473 (9th Cir.1992).
 
 
 28
 In particular, the Union argues that neither its failure to contact Murray about the NEC referral letter nor the "No Solicitation, No Distribution" rule can, as a matter of law, form the basis of an LMRDA violation. Perhaps so. Nonetheless, there remains substantial evidence in the record to support the jury's verdicts. Specifically, evidence of the attempt to confiscate Murray's newsletters, the events of the October 24, 1989 meeting, and the Union's application of Murray's prepaid dues to the arbitration award[8] all suffice to establish a "general scheme to suppress dissent within the union" sufficient to prove a violation of Secs. 101(a)(2) and 102 of the LMRDA.[9] Phelan v. Local 305 of the United Ass'n of Journeymen, 973 F.2d 1050, 1063 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). Clearly, the jury believed Murray's version of events.
 
 C. Punitive Damages
 
 29
 The Union contends that the punitive damages awards against it and its officers are constitutionally excessive. Appellants point to the fact that the punitive damages totaled nearly 800 times the compensatory damages.[10]
 
 
 30
 Punitive damages awards must comply with the standard established by this circuit in Morgan v. Woessner, 997 F.2d 1244 (9th Cir.1993), cert. dismissed, --- U.S. ----, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).[11] Morgan establishes a three-part test to determine whether a punitive damages award violates due process.[12]
 
 
 31
 First, this court must ascertain whether the trial court properly instructed the jury on the purpose of punitive damages, "so that the jury understands that punitive damages are not to compensate the plaintiff, but to punish the defendant and to deter the defendant and others from such conduct in the future." Id. at 1256. The record clearly shows that Judge Walker complied with this mandate in instructing the jury.[13]
 
 
 32
 Second, the trial judge must have given his reasons for upholding the punitive damages award on the record and, in doing so, made some comparison between the amount of punitive damages actually assessed and an alternative figure derived from the facts of the case at hand, as well as from awards in similar cases and the experience of the court. Id. at 1257. In this case, Judge Walker explained that the punitive damages, albeit much higher than the compensatory damages, were justified:
 
 
 33
 What Mr. Murray was deprived of was his free speech rights. That's the sort of thing you can't really put a price tag on. And the jury was, as I understood it, saying that there is no price tag that can be put on that sort of thing, but there's certainly a reason to discourage the union from attempting to stifle the free speech rights of its members.[14]
 
 
 34
 We cannot fault his reasons for upholding the punitive damages awards against Appellants.
 
 
 35
 Third, this court must review the punitive damages award for excessiveness. Id. at 1257-58. "A circuit court should determine whether a punitive damage award exceeds the amount necessary to accomplish the goals of punishment and deterrence in deciding whether it is grossly excessive." Id. at 1258 (applying the standard set by Haslip, 499 U.S. at 17, 111 S.Ct. at 1042). Given the seriousness of the infringement on Murray's freedom of speech, we find that the punitive damages awards in this case are not grossly excessive.
 
 D. Attorney's Fees
 
 36
 The Union argues that the district court's award of attorney's fees to Murray was improper because the litigation did not provide a "valuable service"[15] to the Union membership. We permit successful plaintiffs to recover attorney's fees under the LMRDA where (1) the opposing party acted in bad faith, or (2) the litigation performed a valuable service for the union and its members. Ross v. International Bhd. of Elec. Workers, 544 F.2d 1022, 1025 (9th Cir.1976). A finding of valuable service is reviewed under the clearly erroneous standard. Southerland, 845 F.2d at 799.
 
 
 37
 The district court's award of attorney's fees to Murray was not clearly erroneous. Judge Walker found support based on both bad faith and valuable service.[16] The vindication of Murray's speech rights performed a valuable service for the Union membership. While Murray may well have been a nuisance to the Union leadership, they suppressed him at their peril. The common good is often advanced prudently by visionary nuisances speaking freely. In addition, the evidence on the record and the jury's award of punitive damages support a finding that the Union and its officers acted in bad faith.
 
 E. Judgments As a Matter of Law
 
 38
 Nuisances are not always right, however. In his cross-appeal, Murray contends that the district court erred by entering judgment as a matter of law in favor of Appellants on four of his claims. A directed verdict is reviewed de novo. Zamalloa v. Hart, 31 F.3d 911, 913 (9th Cir.1994). "[A] directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict." McGonigle v. Combs, 968 F.2d 810, 816 (9th Cir.), cert. dismissed, --- U.S. ----, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). We now address each of these claims.
 
 
 39
 1. Breach of the duty of fair representation claims.
 
 
 40
 a. Re NEC referral letter.
 
 
 41
 The trial court properly granted Appellants' motion for a directed verdict on this issue. It is clear from the evidence that the Union did not make a regular practice of notifying Union members at the training center about referral letters, although the Union had done so on occasion. There is no such requirement in the collective bargaining agreement. The Union did not, therefore, have any duty to notify Murray of the referral letter. Accordingly, it did not breach its duty of fair representation by failing to do so.
 
 
 42
 b. Re handling of the NEC grievance.
 
 
 43
 Murray also seeks to bring a breach of the duty of fair representation claim based on the Union's alleged mishandling of his NEC grievance, which Murray mistakenly brought as a hiring hall grievance and had costs assessed against him as a result. This claim, however, is time-barred because it was not brought within six months of the arbitrator's written decision. Galindo v. Stoody Co., 793 F.2d 1502, 1509 (9th Cir.1986).[17] Murray is not entitled to application of the relation-back doctrine because the facts involving the Union's conduct during the grievance procedure were not alleged in Murray's original complaint. Percy v. San Francisco Gen. Hosp., 841 F.2d 975, 979 (9th Cir.1988). The grant of the directed verdict to Appellants on this issue was therefore proper.
 
 
 44
 2. Unlawful discipline under the LMRDA.
 
 
 45
 Murray next argues that the Union's actions in taking his prepaid dues and applying that money to the arbitration costs assessment--thereby forcing him to pay the entire assessment in order to maintain his good standing as a member and eligibility to run for union office--constituted "discipline" for purposes of Sec. 101(a)(5) of the LMRDA. As such, Murray claims, those actions violated his rights because he was not afforded the due process provided under Sec. 101(a)(5).
 
 
 46
 First we consider whether Murray was subjected to discipline. "Discipline" under Sec. 101(a)(5) is a retaliatory act that affects a union member's rights or status as a member of the union. Finnegan v. Leu, 456 U.S. 431, 437, 102 S.Ct. 1867, 1871, 72 L.Ed.2d 239 (1982); Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1478 (9th Cir.1986), aff'd, 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989). Murray maintains that the dues were taken and applied to the arbitration award in retaliation for Murray's speech activities. As he sees it, the Union's action was discipline because, but for his intervention, it would have resulted in the loss of his membership through "nonpayment" of dues, as well as his ineligibility to run for union office, and therefore amounted to discipline.
 
 
 47
 Assuming arguendo that taking Murray's prepaid dues to satisfy the arbitration costs was a form of discipline, the question remains whether Murray was denied due process. Here Murray encounters difficulty. He claims he was entitled to a hearing before the Union applied his dues to the outstanding arbitration award. In support of his position, Murray cites English v. Cowell, 969 F.2d 465 (7th Cir.1992), which held that a union could not, based on a member's felony conviction, terminate his union membership without a hearing. English, however, is easily distinguishable. There the court reasoned that expulsion from the union did not necessarily follow from the member's criminal conviction, although it certainly could be reason enough to expel the member. See id. at 471. In other words, the member was still entitled to the determination that the felony conviction warranted expulsion.
 
 
 48
 Here, by contrast, Murray had already received notice and a full hearing before the assessment of arbitration costs (viz., the arbitration hearing). The application of Murray's dues money to the arbitration award was only an execution on the judgment. There was nothing left to have a hearing about, no decision left to be made. See id. at 471 n. 12. No additional hearing was necessary, and the Union's actions did not violate Sec. 101(a)(5). It was Murray's obligation to replenish his dues. No hearing was necessary to fix that obligation. Thus, the district court correctly granted the Union's motion for a directed verdict on this issue.
 
 
 49
 3. Conversion.
 
 
 50
 Here Murray attempts to refute the basis of the above holding by arguing that the Union's taking his prepaid dues and applying them to the arbitration award amounted to conversion. This argument is meritless. By definition, conversion involves the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another." Black's Law Dictionary 300 (5th ed. 1979) (emphasis added). The Union did not have mere lawful possession of Murray's dues, it also had lawful title to them. Murray had no ownership rights in his prepaid dues with which the Union could interfere. Accordingly, the district court did not err in granting the Union's motion for a directed verdict on this issue.
 
 
 51
 4. Assault and battery.
 
 
 52
 Murray also insists that the jury should have been allowed to decide the assault and battery claims against the Union, Thomas, Davis, and Evans. None of these defendants actually touched Murray. Murray argues that they are nonetheless vicariously liable. He relies on Coats v. Construction & Gen. Laborers Local No. 185, 15 Cal.App.3d 908, 93 Cal.Rptr. 639 (1971), which held that a union could be held liable for a series of brutal assaults committed by its officers where it ratified their actions by not disciplining them.
 
 
 53
 Coats is distinguishable. In this case, ratification is lacking. Here the jury found Durran, Jr., the only officer who actually had physical contact with Murray, not liable for assault and battery. Durran, Sr., who was found liable, was only a rank-and-file member. Although the record shows that Union officers were irritated by Murray, ruled him out of order, told him to sit down and shut up, and forced him to leave meetings on several occasions, these actions do not show that the Union's officers incited or encouraged Durran, Sr.'s assault against Murray. Nor does Murray point to any evidence in the record that shows the Union expressly or impliedly ratified Durran, Sr.'s assaultive behavior. Judge Walker correctly granted Appellants' motion for a directed verdict on these claims.
 
 
 54
 F. Denial of Murray's Motion to Vacate the Arbitration Award
 
 
 55
 Murray, fiercely contesting all issues on which he did not prevail, argues that the district court erred in denying his motion to vacate the McKay arbitration award, which assessed costs against him. Again, Murray's argument fails.
 
 
 56
 First, Murray's motion was untimely. It was not brought within 100 days of the arbitrator's written decision of July 5, 1989. Murray insists that the decision was not final because the actual amount of the costs was not known to him until the Union sent a bill on February 20, 1990. Contrary to Murray's suggestion, the decision was final. The dispute resolution process was exhausted. Kemner v. District Council of Painting & Allied Trades No. 36, 768 F.2d 1115, 1119 (9th Cir.1985). This was not a case in which the arbitrator retained jurisdiction to decide the remedy, thereby implying an intent that the award not be final. See Millmen Local 550 v. Wells Exterior Trim, 828 F.2d 1373, 1376-77 (9th Cir.1987). Rather, it was a purely technical matter for the Union to send its bill for costs.[18] Murray knew, as of the arbitrator's decision on July 5, 1989, that costs were being assessed against him. He has no excuse for his delay in appealing the arbitrator's decision to award those costs.
 
 
 57
 Second, the motion was properly denied on the merits as well. The scope of review of labor arbitration decisions is extremely narrow and highly deferential. Federated Dep't Stores v. United Food & Commercial Workers Union, 901 F.2d 1494, 1496 (9th Cir.1990). The grievance procedure under the collective bargaining agreement is viewed as part of the bargain; therefore, " '[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.' " Id. (quoting United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960)).
 
 
 58
 In this case, the arbitrator interpreted the collective bargaining agreement to allow him to award costs based on his power to "adjust grievances." That interpretation is a "plausible" one, and therefore must be enforced by this court. Id. There is no indication that McKay dispensed his "own brand of industrial justice," that he exceeded the boundaries of the issues submitted to him, or that the award is contrary to public policy. Id.
 
 
 59
 The judgment of the district court is therefore AFFIRMED in all respects.
 
 
 
 *
 Honorable Robert R. Merhige, Jr., District Judge for the District of Virginia, sitting by designation
 
 
 [1]
 Murray brought two suits in district court, which were consolidated: his suit against Appellants and his suit to vacate the arbitration award. These disputes reached this court in the form of three appeals: Appellants' appeal from jury verdicts against them (93-15641), Murray's cross-appeal from adverse directed verdicts (93-16176), and Murray's appeal of the arbitration award (93-16540)
 
 
 [2]
 The jury found that Jesse Durran, Sr. and Bob Davis were not liable for free speech violations
 
 
 [3]
 The jury found in favor of Jesse Durran, Jr. on the assault and battery claim against him
 
 
 [4]
 See Appellants' Excerpt of Record (E.R.) at 200-03
 
 
 [5]
 Following that statement were two phrases that were crossed out but still legible: "PEOPLE ON EITHER SIDE" and "At least one person on each side[.]"
 
 
 [6]
 See E.R. at 205-06
 
 
 [7]
 The Second Circuit noted that
 whatever small possibility existed of continuing with the remaining eleven jurors ... was eliminated by the district judge's remarks to the jury.... Those remarks praised the eleven lavishly for their efforts to persuade [the holdout juror] to vote to convict.... [T]he effect was to eliminate any possibility that the remaining eleven jurors could resume deliberations with an open mind.
 Id. at 24.
 
 
 [8]
 The Union appears to argue that the jury should not have been allowed to consider evidence concerning its actions in applying Murray's prepaid dues to the arbitration award because Murray failed to exhaust his administrative remedies. However, in cases brought under the LMRDA, whether to require exhaustion of internal union procedures is a matter left to the district court's discretion. Ornellas v. Oakley, 618 F.2d 1351, 1354 (9th Cir.1980). There is no indication that Judge Walker abused his discretion in not requiring exhaustion here, particularly given that the Union did not raise the exhaustion issue until the eve of trial
 
 
 [9]
 The statute provides:
 Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting....
 LMRDA, Sec. 101(a)(2), 29 U.S.C. Sec. 411(a)(2). Section 102 creates a federal cause of action for infringement of the rights provided in Sec. 101. LMRDA, Sec. 102, 29 U.S.C. Sec. 412.
 
 
 [10]
 For the LMRDA violations, Murray was awarded $100 in compensatory damages and $77,500 in punitive damages against the Union and four of its officers
 
 
 [11]
 This court developed the Morgan standard to comply with the Supreme Court's decision in Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)
 
 
 [12]
 The test is equally applicable to punitive damages imposed by state or federal courts. Morgan, 997 F.2d at 1255
 
 
 [13]
 See Reporter's Transcript (R.T.) at 4-735
 
 
 [14]
 E.R. at 491
 
 
 [15]
 In its brief, the Union used the term "substantial benefit"; however, the terms "valuable service" and "substantial benefit" are synonymous. Southerland v. International Longshoremen's & Warehousemen's Union, 845 F.2d 796, 799 (9th Cir.1987)
 
 
 [16]
 R.T. (July 30, 1993) at 21
 
 
 [17]
 Murray argues that he is entitled to equitable estoppel based on the Union's delay in billing him for the costs awarded by the arbitrator's decision. We reject this argument. The fact that the Union did not promptly send Murray the bill did not change the fact that Murray was on notice as of the arbitrator's decision on July 5, 1989 that those costs were going to be assessed against him. His delay in filing his duty of fair representation claim is therefore not excused
 
 
 [18]
 The arbitrator's decision specified that Murray pay for the costs of his services and of the hearing transcript. E.R. at 403