William KINSLOW, Plaintiff,

v.

Tommy BRISCOE, et al., Defendants.

No. 92 C 4120.

United States District Court,
N.D. Illinois,
Eastern Division.

March 24, 1999.

Walter C. Greenough, Schiff, Hardin & Waite, Gerald A. Goldman, Arthur R. Ehrlich, Goldman & Ehrlich, Chicago, IL, for plaintiff.

Chester L. Blair, Blair & Cole, Chicago, IL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

Some years ago this now-ancient lawsuit was placed in the deepfreeze by this Court's colleague Honorable James Alesia, even though he had entered a final pretrial order ("FPTO") on January 27, 1994, because the two individual defendants had already been convicted of related criminal offenses and were consequently serving prison terms. In May 1998 Kinslow successfully moved for reinstatement of the case (it had been dismissed by agreement, with leave to reinstate). On May 12, 1998 this District Court's Executive Committee ordered that the case be reassigned by lot because Judge Alesia had then taken senior status and opted for reassignment under 28 U.S.C. § 294(b), and that brought the case to this Court's calendar. After some further procedural issues were dealt with, this Court scheduled the case for trial, and a three-day bench trial was held on March 1 through 3, 1999.

What follows are this Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

*Findings of Fact*

*Parties*

1. Plaintiff William Kinslow ("Kinslow"), who was an employee of the Chicago Main Post Office from 1961–95, joined defendant American Postal Workers Union—Chicago Local ("Union") in 1971. Kinslow served as a Steward from 1977–81 and as Union's Executive Vice President from 1981–84.

2. Union represents over 4,000 employees of the Chicago Post Office. It has annual revenues of approximately $2 million, mostly from dues from its members. Herby Weathers ("Weathers") has served as its President since the resignation of Tommy Briscoe ("Briscoe") in 1993.

3. Defendant Briscoe, who died just a few days before the commencement of trial (a fact that was learned by Kinslow and his counsel and this Court only at the time the trial actually began), had served as Union President from 1981 until 1993. Defendant Elizabeth Bell ("Bell") had served as Union's Secretary or Treasurer or both from 1981 until 1992.

*Events Relating to the Initial Complaint*

4. Shortly after his 1981 election as Executive Vice President, Kinslow began to criticize Briscoe and Bell for misusing Union funds: Kinslow accused them of using Union funds to lease Briscoe's car (P.Ex. 2), of bouncing checks in the Union's Bank account (P.Ex. 4) and of a failure to pay property taxes and utility bills (P.Ex. 37). Kinslow further accused Briscoe of illegally borrowing money from Union and of improper actions regarding "Sir Finance" (a Briscoe personal enterprise) (P.Ex. 37), and of stealing elections and of running up large legal fees "to stay out of jail" (P.Ex. 37). Kinslow's preferred means of communicating those charges was to prepare broadsheets that he then distributed at Union meetings.

5. Kinslow also raised several of his charges in letters to the National Union

(sometimes referred to here simply as "National") (P.Ex. 13), but he never received a response to those letters from National.

6. Under Union's Constitution (P.Ex. 42) officer elections are held every three years. Kinslow ran unsuccessfully against Briscoe for President in 1984, 1987 and 1990. In the latter two elections, he was Briscoe's only opponent.

7. In early 1991 Briscoe and Bell were indicted by a federal grand jury in this District Court in Case No. 91 CR 277. In a June 1993 jury trial Briscoe was convicted of stealing Union funds in connection with "Sir Finance" (P. Exs.35, 36). Bell entered a plea of guilty to aiding and abetting Briscoe in obtaining a $20,000 loan from the Union in violation of the $2,000 limit imposed by 29 U .S.C. § 503.

8. On October 8, 1991 Kinslow sent a letter to Bell requesting copies of Union's financial records and minutes of its Executive Board and General Membership meetings (P.Ex. 12). Kinslow testified (and this Court credits) that he wanted those records to investigate the possible misuse of Union funds. Bell admitted she received that letter but did not respond to it.

9. In 1991 and 1992 Union Stewards refused to file several personal grievances requested by Kinslow. Kinslow complained that his grievances were being ignored in a letter to his Steward (P.Ex. 6), and then in letters to Briscoe (P. Exs. 7, 15, 16 and 18). Weathers testified that this was the proper procedure for Kinslow to have followed. Nonetheless Kinslow never received a response to any of his letters.

10. Kinslow's major personal grievance dealt with the refusal of the Post Office to assign him overtime work (P. Exs. 6, 15, 16 and 18). Kinslow also raised that issue with National (P.Ex. 19), but National simply referred him back to the local Union Steward (P.Ex. 20).

11. Kinslow testified that he earned approximately $20,000 a year in overtime (over and above his $45,000 salary) in 1992 and 1993, and he estimates that he would have earned similar amounts in overtime in 1990 and 1991 had his grievances been filed and had he then been allowed to work overtime. Although defense testimony was to the effect that work assignments were generally left to the Post Office, it did not contradict either Kinslow's claim that Union refused to file his grievances or his claim that, had he been allowed to work overtime, he would have earned an additional $20,000 in each of 1990 and 1991. This Court credits Kinslow's claim.

12. Every witness agreed that the grievance procedure was an important benefit of Union membership. Every witness agreed that the Stewards had an initial obligation to assist Kinslow with his grievances, even if they later determined them to be frivolous. Bell admitted it was improper for the Stewards to have refused to assist Kinslow with his grievances.

13. Kinslow also testified that he was being threatened and disparaged by Union Stewards, and that he complained about such treatment to Briscoe without success (P.Ex. 7). This Court credits that testimony as well.

14. Kinslow filed his initial Complaint in this action on June 23, 1992.[1] In it he alleged that defendants (a) were seeking to punish and deter him from exercising his right of free speech by refusing to file his grievances and by trying to intimidate him and (b) were denying him the right to inspect Union's financial records to determine whether Briscoe and Bell had misused Union funds.

*Events Relating to the Amended Complaint ("AC")*

15. On the same June 23 date Kinslow sent a letter to all members of Union's Executive Board other than Briscoe and

---

1. Because most of the other events referred to in these Findings also took place in 1992, each date cited hereafter without a year designation was also a 1992 occurrence.

Bell (P.Ex. 38). In it Kinslow reminded the Board that Briscoe had been indicted in 1991 and described several areas in which Briscoe had assertedly misused Union funds. Kinslow demanded that the Executive Board conduct a full financial audit to determine whether Briscoe had indeed misused Union funds.

16. On July 18 Briscoe (rather than a Union officer or Executive Board member who was not implicated in Kinslow's charges) sent Kinslow a letter (P.Ex. 39) that acknowledged receipt of Kinslow's letter (P.Ex. 38) and asked Kinslow to appear at an Executive Board meeting on July 25 with "all documentation" Kinslow had to support the allegations in his letter. Briscoe's letter did not warn Kinslow of any possible adverse consequences that might arise from his failure to appear at that meeting.

17. On July 20 Briscoe sent a letter (P.Ex. 40) to all Executive Board members requiring their attendance at the July 25 meeting to discuss Kinslow's letter.

18. On July 23 Kinslow wrote back to the Executive Board (P.Ex. 53). Kinslow suggested that the Executive Board should seek legal advice and should not allow itself to continue to be misled by Briscoe. Kinslow elaborated upon his allegations concerning Briscoe's misuse of Union funds and Union's failure to respond to Kinslow's requests to review its financial information. Kinslow questioned why the Executive Board was only now requesting his documents and suggested that the Executive Board should have conducted its own investigation. Kinslow also expressed his concern for his personal safety should he appear at the July 25 meeting.

19. Kinslow did not attend the July 25 meeting. He testified that he did not do so out of fear for his personal safety and out of a sense of futility, given that the Executive Board appeared to be controlled by Briscoe. Though the evidence was insufficient to support a finding that Kinslow's fears for his personal safety were well founded, this Court finds Kinslow's

futility concern was both valid and a justifiable reason for nonattendance (among the many substantial items of evidence on that score, the fact that it was Briscoe himself—though he was not an addressee of Kinslow's June 23 letter to the Executive Board (Finding 15) and he was the direct target of Kinslow's accusations—who responded and convened the meeting, coupled with the total inaction on Union's part thereafter in connection with the charges, serves to demonstrate such futility). Neither Bell nor Weathers claimed to remember what happened at the meeting. Although minutes of the meeting had been prepared, Union did not produce them either before or at trial.

20. On August 17 Bell sent Kinslow a letter notifying him that charges had been brought against him by the Executive Board at the July 25 meeting (P.Ex. 27) and advising him that a hearing on the charges would be held by the Executive Board on September 20. That notice specified only one charge against Kinslow—an asserted violation of Union Constitution Art. 14, § 1(d) (P.Ex. 42) by engaging in four instances of conduct that would assertedly expose Union to civil liability:

 1. filing this lawsuit seeking damages in excess of $100,000;

 2. seeking fees and costs in this lawsuit;

 3. filing an earlier lawsuit against Union in 1984 seeking $1 million in damages; and

 4. refusing to appear at the July 25 Executive Board meeting "with documentation to prove his allegations against" Briscoe.

That fourth item was of course a total non sequitur, and at trial neither Weathers, Bell nor Union's counsel (quite understandably) was able to explain how Kinslow's refusal to appear at the July 25 meeting might conceivably have exposed Union to civil liability.

21. On September 7 Kinslow wrote back to Briscoe and the Executive Board,

seeking information to defend himself on the charges brought against him (P.Ex. 28). He never received a response to that letter.

22. On September 15 Kinslow again wrote to Briscoe and the Executive Board (P.Ex. 30). In that letter Kinslow denied the charges against him and noted the refusal of the Executive Board either to take action against Briscoe and Bell or to provide Kinslow with the financial information that he had requested. In addition he noted the Executive Board's refusal to send him the information he had requested to defend himself against the charges brought against him. Kinslow concluded that those charges had been brought in retaliation for his efforts in exposing Briscoe's corruption and stated that, for reasons of personal safety, he would not appear at the September 20 hearing.

23. Kinslow did not in fact attend the September 20 meeting. Once again he testified that he did not do so out of fear for his personal safety and out of a sense of futility, given that the Executive Board appeared to be controlled by Briscoe. This Court's findings on that score in Finding 19 apply here as well. Again neither Bell nor Weathers claimed to remember what happened at the meeting. And again even though minutes of the meeting had been prepared, Union did not produce them either before or at trial.

24. At the regularly scheduled meeting of Union's general membership on October 11, the members voted unanimously to expel Kinslow from the Union. Briscoe himself conducted the vote, and although secret ballots had been used for other Union matters, in this instance the members were required to vote by standing in front of Briscoe to show their support for the motion. As before, although minutes of the meeting had been prepared, Union did not produce them either before or at trial.

25. On October 11 (a Sunday) Bell mailed Kinslow a letter notifying him that he had been expelled and that he had 72 hours "from receipt of this letter" to appeal to National (P.Ex. 43). On October 15 Kinslow did send a letter appealing to National (P.Ex. 51), noting the Executive Board's refusal to conduct its own investigation of Briscoe and its refusal to provide Kinslow with the documents he had requested. In addition, the letter provided various reasons as to why his expulsion was improper. Together with the letter, Kinslow sent National various documents supporting his claims. Kinslow never received a response to that letter.

26. On October 15 Kinslow also wrote to the Executive Board (P.Ex. 31) requesting all documents relating to his expulsion, including minutes of the Executive Board and General Membership meetings. Kinslow never received a response to that letter either. On November 4 Kinslow sent a follow-up letter to the Executive Board (P.Ex. 32), but once more he never received a response to that letter.

27. Kinslow also sent a follow-up letter to National on December 30 (P.Ex. 55), in which he referred to his earlier letter as his "appeal letter." Once again he never received a response to that letter. Then Kinslow sent a final follow-up letter to National on January 6, 1993 (P.Ex. 56)— again with no response at any time.

28. On March 24, 1993 Kinslow amended his Complaint by filing the AC, which includes his allegation that he had been improperly expelled from Union in violation of 29 U.S.C. § 411(a)(4).

*Issues Bearing on Liability*

29. Kinslow testified that he had problems dealing with Post Office management due to Union's refusal to help him on grievances, and that due to his later expulsion he lost his right to participate in Union affairs and run for Union office and was treated as an outcast by other Union members. Weathers acknowledged the importance of the rights cited by Kinslow, but he testified that after Kinslow's expulsion Union did assist him in pursuing three grievances. Even if that took place, it occurred after this lawsuit had been filed,

when Union was already on notice of Kinslow's claims of its *prior* refusal to pursue his grievances. And as such those curative efforts are not at all probative as a possible defense against the earlier claims (from an analytical perspective, this view represents the flip side of Fed.R.Evid. 407 as to subsequent remedial measures). In that respect Union's failure to have pursued Kinslow's grievances during the 1990–91 time frame (see Finding 11) stands uncontradicted.

30. Kinslow testified that he attended most Union meetings but rarely signed in, and the sign-in books for Union meetings (D.Ex. 17) rarely do contain Kinslow's signature. Whether or not Kinslow has accurately portrayed the frequency of his attendance is really a nonissue in this litigation, for although Kinslow may not in fact have attended many of the general membership meetings, it is undisputed that he was active in Union affairs through his distribution of flyers criticizing Union's leadership and in his repeated attempts to run for office.

31. From the evidence adduced at trial, Kinslow was the only member in the last 20 years to have been expelled from Union, and he was the only member ever to have requested a review of Union's financial documents.

32. Weathers testified—but without any support in documentary form, and without making any statement as to how and when the claimed policy was established (note the explanation in Finding 31 that no other member ever requested such a review, either before or after Kinslow did so)—that it was Union policy that members could review Union's financial records only in Union's offices. Even aside from the exceedingly dubious nature of Weathers' testimony as to such a policy (which this Court discredits), Weathers could not say how that alleged policy was ever communicated to Kinslow, nor could he explain why Union did not respond to Kinslow's requests for documents by simply advising him that he would have to look at them in Union's offices. Indeed, Bell expressly testified that had Kinslow asked to inspect the documents under her control, she would have refused to produce them unless ordered to do so by Briscoe.

33. Union's Executive Board never considered, much less undertook, an investigation into the conduct of Briscoe and Bell, nor did the Executive Board seek legal advice regarding the manner in which it handled Kinslow's expulsion.

34. On March 5, 1999 this Court ordered that Kinslow be reinstated to Union membership, granting such preliminary injunctive relief based upon the representations made to it by counsel for both parties that nominations for Union offices were to be made on or about March 12. This Court orally directed Union's counsel to provide Kinslow's counsel with a written description of Union's nominating procedures so that Kinslow could abide by them.

35. According to the March 17, 1999 affidavit submitted by Kinslow's counsel, Union's counsel did provide him with the written nominating procedures on March 5. Kinslow's counsel immediately expressed his concern over the provision requiring that all nominees be Union members as of March 1. On March 6 Kinslow sent a letter to Union nominating himself for President. On March 16 Union's counsel confirmed that Union's Election Committee would in all likelihood refuse to place Kinslow's name on the ballot because he was not a Union member on March 1. See Conclusion 16 for more on this subject.

*Conclusions of Law*

*Claims Under Act § 411*

1. In part the Labor Management Reporting and Disclosure Act (the "Act," 29 U.S.C. §§ 401–531[2]) guarantees every un-

---

**2.** Citations to Act provisions will take the form "Act § —," using the Title 29 numbering rather than the Act's internal numbering.

ion member the right of freedom of speech (Act § 411(a)(2)). And Act § 411(a)(4) expressly provides:

> No labor organization shall limit the right of any member thereof to institute an action in any court... irrespective of whether or not the labor organization or its officers are named as defendants...*Provided,* that any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal...proceedings against such organizations or any officer thereof.

Act § 412 authorizes any person whose rights under the Act have been infringed to bring a civil action in federal court. To prevail on that aspect of Kinslow's claims in this action, he must prove (see, e.g., *Black v. Ryder/P.I.E. Nationwide, Inc.,* 970 F.2d 1461, 1469 (6th Cir.1992)):

> 1. that his conduct was an exercise of free speech as defined and protected by the Act;
>
> 2. that defendants took action against him in substantial part because of his exercise of his rights under the Act; and
>
> 3. that he suffered injury as a proximate result of defendants' actions.

2. It is uncontroverted, based upon all of the evidence, that Kinslow engaged in the spirited exercise of his right of free speech in criticizing Union leadership (and Briscoe and Bell in particular) from 1981 until he was expelled from Union in 1992. Although defendants seek to point to Kinslow's ability to express his views as an attempted defense, the controlling factor is not whether Kinslow was able to exercise his right of free speech (for example, by the preparation and distribution of statements criticizing Briscoe), but rather whether defendants retaliated against him for doing so.

■ 3. Again based on all of the evidence, defendants did retaliate against Kinslow for his criticism referred to in Conclusion 2. Kinslow testified that Union and Briscoe refused to file his grievances and threatened and disparaged him, and his contemporaneous letters support his testimony. Defendants did not refute the gist of Kinslow's charges. Those actions violated Act § 411(a)(2) (*Giordani v. Upholsterers Int'l Union,* 403 F.2d 85 (2d Cir.1968), holding improper the expulsion of union member for charging union with misappropriating monies from pension funds). And Union's expulsion of Kinslow from membership for filing this case (an expulsion led by Briscoe) was in direct violation of Act § 411(a)(4) (*Ross v. International Bhd. of Elec. Workers,* 544 F.2d 1022, 1024–25 (9th Cir.1976), affirming injunction against collection of fine from union member for filing suit against union).

■ 4. Union contends that Kinslow's claims fail because he did not exhaust his internal remedies before filing suit. That contention is rejected for several independent reasons:

> (a) At most such a defense could apply to the claims under Act § 411(a)(4) raised in Kinslow's AC. By contrast, his original claims under Act § 411(a)(2) are not subject to an "exhaustion of remedies" defense.
>
> (b) In any event, Kinslow did exhaust his remedies. Beginning on October 15 (just four days after the October 11 meeting that had voted his expulsion), Kinslow repeatedly sought information and relief from both Union and National following his expulsion, but he never received any response from either of them. As for the 72–hour requirement within which an appeal is required to be taken, that was satisfied by Kinslow: Kinslow could not have received the mailed letter dated Sunday, October 11 and notifying him of his expulsion earlier than October 12, and his October 15 objection was therefore transmitted within a 72–hour period after such receipt.

(c) Even had that not been the case, in any event it was futile for Kinslow to pursue his internal remedies. For years Kinslow had complained both to Union and National about his treatment by Union and about Briscoe's misuse of Union funds, but he never received a response from either. Moreover, neither Union nor National ever conducted an investigation of Briscoe's misdeeds despite substantial evidence that they existed—including Briscoe's federal indictment in 1991. It is clear that Briscoe controlled Union's Executive Board, and it appears that National was unwilling to interfere with Briscoe's conduct of Union's business. See *Kuebler v. Cleveland Lithographers & Photoengravers Union Local 24-P*, 473 F.2d 359, 364 (6th Cir.1973), finding plaintiff was denied fair hearing by the refusal of local and international councils of union to supply plaintiff with requested documents and information.

(d) Finally, even if *none* of those factors were to be deemed controlling, the relevant case law treats the need to exhaust intra-union administrative remedies as discretionary rather than as a mandatory jurisdictional bar (see, e.g., *Chadwick v. International Bhd. of Elec. Workers Local Union No. 175*, 674 F.2d 939, 941–42 (D.C.Cir.1982) (per curiam) and cases cited there). What these Findings and Conclusions reflect is plainly a situation calling for the exercise of that discretion in Kinslow's favor.

*Claims Under Act § 431*

5. Under Act § 431(c) a union is obliged to permit "any member...for just cause to examine any books, records, and accounts" necessary to verify the union's filed financial reports. That section expressly provides that the duty of the union and its officers may be enforced by the filing of a civil action.

■ 6. "Just cause" supporting the right to inspection "need be only a suspicion that would put a reasonable union member to further inquiry" (*Landry v. Sabine Independent Seamen's Ass'n*, 623 F.2d 347, 349 (5th Cir.1980), affirming the grant of a right to inspect records to investigate suspected double payments to union officials; *Cook v. Teamsters Local 705*, No. 96 C 8009, 1997 WL 433659, at *2–*3 (N.D.Ill. July 28, 1997), also granting inspection based on a showing of "just cause").

■ 7. It cannot be denied that the 1991 federal indictments of Briscoe and Bell constituted "just cause" supporting Kinslow's demand to inspect Union's financial records. Accordingly Union (led by Briscoe) violated Act § 431(c) by refusing to allow Kinslow to inspect those records.

*Relief*

8. Kinslow is entitled to review Union's financial records. While Union may insist that Kinslow inspect those records at Union headquarters, Union is ordered to provide Kinslow with adequate facilities for doing so and to provide him with copies of any documents that he requests at his expense. To the extent that any Union financial records are still in the possession of the Department of Justice, the Department of Labor or any other government body, Union is ordered promptly to request the return of those documents (and to send Kinslow's lawyers a copy of each such request).

■ 9. Kinslow is entitled to reinstatement to full membership in Union (*Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981); *Kuebler*, 473 F.2d at 364). To facilitate his ability to run for Union President in the upcoming Union elections, this Court has previously granted preliminary injunctive relief that initially ordered such reinstatement on March 6, 1999 and then, when it developed that Union's election rules required membership as of March 1, amended that order to require that Union treat Kinslow as a member effective on that March 1 date (subject to his obligation to pay Union dues for the entire period

beginning March 1). Because Kinslow has proved his entitlement to that relief by clear and convincing evidence (let alone a mere preponderance), that preliminary relief is ordered to be made permanent.

10. Union and all of its officers and agents, and any persons in active concern and participation with any of them, are permanently enjoined from taking any steps "to punish or retaliate against [Kinslow] either for his exercise of the right of freedom of speech and assembly or other rights guaranteed him by law, including his prosecution of this action" (*Kuebler,* 473 F.2d at 364).

11. Kinslow is entitled to damages arising from Union's violations of Act § 411. Those damages include $40,000 in overtime wages that Kinslow would have earned in 1990 and 1991 but for Union's failure to file Kinslow's grievances (*Ryan v. International Bhd. of Elec. Workers,* 387 F.2d 778, 780 (7th Cir.1967), affirming award of salaries lost due to wrongful expulsion from union). Union is ordered to pay that amount to Kinslow.

 12. It is more difficult to assess damages with respect to Kinslow's loss of the benefits of union membership and the impairment of his right to freedom of speech. In *Black,* 970 F.2d at 1464–65 the plaintiff's union membership was suspended for six months after he had picketed union offices to bring the corruption of local union officials to the attention of the international union. In language equally applicable to this case, *Black, id.* at 1466 stated that the suspension "made it impossible for him to run for union office, to speak out at meetings, or to participate fully in the movement to rid the union of local corruption." In *Maceira,* 649 F.2d at 11–12 the plaintiff was removed as a union steward in reprisal for opposing union leaders, a removal that was deemed to chill plaintiff's "almost absolute" right "to discuss freely and to criticize the management of their union and the conduct of their officers" (*id.* at 14). Here Union's conduct (led by Briscoe) had the same effects but was far more egregious, be-

cause the retaliatory efforts against Kinslow lasted for over ten years and he has been deprived of his Union membership for over six years. Nonetheless, neither *Black* nor *Maceira* involved the award of damages, and *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) teaches—in the conceptually related context of a 42 U.S.C. § 1983 action for the deprivation of First Amendment rights—that no damages may be awarded solely for the deprivation of any constitutional rights. Although it is also true that intangible harms are compensable in damages (*id.* at 307, 106 S.Ct. 2537), no testimony here has established such harms in such a manner as to permit their quantification. Accordingly, apart from the permissible and richly deserved award of punitive damages to Kinslow (see *id.* at 306 & n. 9, 106 S.Ct. 2537), which are dealt with in Conclusion 13, Union is ordered to pay only nominal damages of $1 to Kinslow by reason of the harms referred to in this Conclusion (*Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), reaffirmed in *Stachura,* 477 U.S. at 307–08, 106 S.Ct. 2537).

 13. Notwithstanding the nominal compensatory damages awarded in Conclusion 12, Kinslow is clearly entitled to a substantial award of punitive damages. In *Murray v. Laborers Union Local No. 324,* 55 F.3d 1445 (9th Cir.1995) union officials attempted—in efforts ultimately found improper in the ensuing litigation—to prevent Murray from distributing literature at one union meeting and to eject him from another (*id.* at 1449–50). *Murray, id.* at 1453 upheld an award of $77,500 in punitive damages over and above an award of $100 in compensatory damages, observing that "punitive damages are not to compensate the plaintiff, but to punish the defendant and to deter the defendant and others from such conduct in the future." In doing so the court quoted with approval the trial court's explanation that while it is difficult to "put a price tag" on the right of

free speech, "there's certainly a reason to discourage the union from attempting to stifle the free speech rights of its members" (*id.*). Similarly, *Doty v. Sewall*, 908 F.2d 1053, 1062 (1st Cir.1990) upheld a jury's award of $300,000 in punitive damages (*id.* at 1056) when plaintiff. remained a union member but "was excluded from some type of union activities for three years" (*id.* at 1062 n. 8). *Doty, id.* pointedly observed that "where a jury has found suppression of a union member's efforts to expose corrupt union practices, the award of punitive damages may help to deter similar union conduct."

14. Here it cannot be gainsaid that Union not only attempted to suppress Kinslow's free speech, but that it succeeded in doing so for more than six years by expelling him from membership. Even worse, Union expelled Kinslow precisely because he was trying to expose the corruption of its leaders—corruption confirmed in the most decisive way by Briscoe's being criminally convicted by proof by a reasonable doubt and by Bell's plea of guilty to a criminal charge. Yet the only member whom Union chose to expel was Kinslow, the harshest critic of its officers.

15. Nor can Union now seek to escape liability by disassociating itself from Briscoe, because it failed to do so when it mattered. Testimony by both Bell and Weathers demonstrates that while Briscoe was President he ran Union as his personal fiefdom. No one on the Executive Board was willing to challenge him, and that obeisance continued unabated for 2-1/2 years between Briscoe's indictment and his criminal conviction. In a graphic confirmation of Sophocles' aphorism that "None love the messenger who brings bad news,"[3] the Executive Board gave its stamp of approval to Briscoe by following his lead in voting unanimously to expel Kinslow for seeking to expose Briscoe's corruption, even though it knew that Briscoe had already been indicted for the very conduct about which Kinslow complained.

16. That irresponsible conduct has been aggravated by the fact that during the five years since Briscoe went to jail and Weathers took over as Union's President, the Executive Board has done absolutely nothing to make things right with Kinslow. To the contrary, Union not only stubbornly continued to defend this case (as was its right) but sought to do so on wholly untenable grounds (as was not its right). Most recently, the proposed enforcement by Union's Election Committee of the March 1 requirement of Union membership would have frustrated the purpose of this Court's order of March 5, intended as it was to enable Kinslow to run for Union office in the forthcoming election. Knowing that purpose, Union should have apprised this Court of the problem promptly so that the technical roadblock would be eliminated. Instead it took the effort of Kinslow's counsel to bring the matter to this Court's attention when the problem was disclosed to him, coupled with this Court's prompt action in response to that information. (see Conclusion 9), to avert that frustration of purpose. But even aside from this most recent problem, the situation disclosed by the evidence at trial is dramatically different from that presented in *Black*, 970 F.2d at 1465, where newly-elected union officials promptly rescinded the retaliatory acts of their predecessors.

17. Although a substantially larger award of punitive damages could well be made (see *Doty*, referred to in Conclusion 13, awarding $300,000 in a less egregious situation), under the circumstances of this case Kinslow is certainly entitled to an award of punitive damages in the amount of $150,000. Union is ordered to pay Kinslow that amount in addition to the monetary awards in Conclusions 11 ($40,000) and 12 ($1).

---

**3.** Compare the classic anecdote of killing the Persian messenger who brought word of a military defeat.

■ 18. Finally, Kinslow is entitled to an award of his attorneys' fees. Successful plaintiffs may recover their fees under Act § 412 "where (1) the opposing party acted in bad faith, or (2) the litigation performed a valuable service for the union and its members" (*Murray*, 55 F.3d at 1453). Even though a number of the views expressed in Kinslow's writings are bigoted and highly distasteful (bringing into play the concept of "freedom of speech for the thought we hate"), what *Murray, id.* at 1454 went on to say could well have been written for this case:

> The vindication of Murray's speech rights performed a valuable service for the Union membership. While Murray may well have been a nuisance to the Union leadership, they suppressed him at their peril. The common good is often advanced prudently by visionary nuisances speaking freely. In addition, the evidence on the record and the jury's award of punitive damages support a finding that the Union and its officers acted in bad faith.

Accord, *Ross*, 544 F.2d at 1025 ("By defending protection of the right to sue [under Act § 412], Ross benefitted all the union members"). Hence Kinslow is entitled to recover his attorneys' fees under both the "valuable service" and the "bad faith" standard.

■ 19. Act § 431(c) also supports Kinslow's entitlement to recover his attorneys' fees. Under that section "attorneys' fees should be awarded absent special circumstances rendering such an award unjust" (*Landry*, 623 F.2d at 350). No such special circumstances exist in this case.

4. Because Briscoe died only a few days before the trial began (as stated earlier, that was a fact unknown to this Court until the day the trial began) and because no personal representative had been appointed at the time of trial, no judgment is ordered to be entered against him for what would otherwise be joint and several liability for all compensatory damages and an independent judgment for punitive damages. As for Bell, her lack of involvement in the conduct referred to in

20. It is irrelevant that most of the work of Kinslow's counsel was done on a pro bono publico basis, because Kinslow and his counsel have borne the cost of this litigation themselves (*Cole v. Hall*, 462 F.2d 777, 780–81 (2d Cir.1972), affirming award of fees to pro bono counsel under Act § 412; see this District Court's General Rule ("GR") 3.87D).

21. Quantification of the amount of attorneys' fees to be awarded shall take place under the procedures established by GR 46 and 47. That future determination does not affect the finality of the judgment ordered to be entered now in favor of Kinslow and against Union[4] in the sum of $191,000 (see *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)).

Conclusion 11 negates any liability for the compensatory damages referred to there, her involvement in the conduct referred to in Conclusion 12 would at most render her jointly and severally liable for the nominal compensatory damages, and her position as pretty much a lackey subservient to Briscoe's domination in the respects referred to in Conclusion 12 militates against any punitive damages award against her.